# EXHIBIT C

## BEFORE THE INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## OF THE AMERICAN ARBITRATION ASSOCIATION

In the Matter of Arbitration Between
T.Co Metals LLC,
CLAIMANT,

No. 50 143 T 00278 06

-and-

Dempsey Pipe & Supply Inc.,
RESPONDENT.

## T.CO METALS LLC'S PRE-ARBITRATION MEMORANDUM OF LAW

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ......................................................................................................... 1

II.   ARGUMENT ............................................................................................................... 3

    A.    T.Co Is Entitled To An Award On Its Claim For Unpaid Bills In The Amount Of $338,039.72 With Interest. ...................................................... 3

        1.    Dempsey Must Pay For The Goods It Accepted From T.Co .................... 3

    B.    Dempsey's Counterclaims Should Be Denied ...................................... 4

        1.    T.Co And Dempsey Never Entered Into An Oral Compensation Agreement. ........................................................................................ 6

            a.    Mr. Thypin's Denial Of Any Oral Compensation Agreement ................................................................................. 6

            b.    Mr. Dempsey's Conduct Belies Any "Oral Compensation Agreement." ............................................................................. 8

        2.    Even If The Arbitrator Finds That T.Co And Dempsey Entered Into An Oral Agreement, It Is Unenforceable. .......................................... 9

            a.    The Oral Compensation Agreement Is Unenforceable Under The Contracts' Standard Terms And Under New York Law. ................................................................................ 10

                (1)    Oral Modifications To The Sales Contracts Are Unenforceable Under §1.1 Of The Standard Terms And Conditions. ............................................................. 10

                (2)    The Agreement As Alleged Does Not Satisfy The Statute Of Frauds. ............................................................. 12

                (3)    The Doctrines Of Waiver By Part Performance And Estoppel Do Not Save Dempsey From The Statute Of Frauds Because The Parties' Conduct Was Entirely Consistent With The Terms Of The Sales Contracts. ...................................................................... 13

            b.    The Alleged Agreement Is Too Indefinite To Be Enforced ........ 14

                (1)    The Essential Terms Of Price And Quantity Cannot Be Determined By Reference To A Formula, Or Any Other Extrinsic Evidence. ........................................ 17

    C.    Dempsey Cannot Find Any Evidence To Support Its Recent Accusations Of Fraudulent Inducement And Bad Faith ............................................. 20

        1.    The Arbitrator's Findings Of Fact Largely Dispose Of Dempsey's Fraudulent Inducement And Bad Faith Accusations. ............................ 20

# TABLE OF CONTENTS

Page

2.    T.Co Repeatedly Sought To Fulfill Its Obligations Under The
Sales Contract, But Dempsey's Inactions In Breach Of Its
Obligations Thwarted These Good Faith Efforts. ................................... 21

D.    Dempsey's Counterclaims Are Both Factually And Legally Without Merit ...... 24

1.    Dempsey Failed To Give T.Co Proper Written Notice Of Its Claim
In The Form Required By The Sales Contracts And Dempsey's
Breach Of Its Central Obligations In This Regard Prejudiced T.Co
Requiring That The Counterclaims Be Barred. ..................................... 24

a.    T.Co Has Been Severely Prejudiced To The Extent That
Dempsey Has Failed To Give Adequate Notice Of Its
Entire Claim. ............................................................. 26

2.    The Sales Contracts, And Even The Alleged "Oral Agreement"
Bar The Damages As Now Claimed. ...................................... 27

a.    Dempsey Itself Valued The Claim At No More Than $18
Per Piece, Or $269,902. .................................................. 27

3.    Factually, The Damage Claim Fails Because As Stated It Is Not In
Accordance With The Terms Of The Alleged "Oral Agreement." ......... 27

a.    The "Oral Agreement" Does Not Allow The Losses
Dempsey Now Claims. ................................................... 27

4.    The Sales Contracts Expressly Limits T.Co's Liability, And Does
Not Hold T.Co Liable For Any Of The Remedies Dempsey Seeks
In Its Counterclaims. ..................................................... 28

5.    To The Extent That Dempsey's Counterclaims Are For
Consequential Damages, They Are Expressly Disclaimed In The
Sales Contracts As Permitted Under The N.Y.U.C.C. ............................. 30

E.    Dempsey Cannot Substantiate Any Of The Damages It Seeks ........................... 33

1.    Dempsey Cannot Prove That Any Of The Pipe It Purchased From
T.Co Caused Any Damages Because Dempsey Cannot Trace The
Material Through Its Inventory, Which Included Material From
Other Suppliers. .......................................................... 33

a.    Because Dempsey Processed And Sold Material Well In
Excess Of The Quantity Received From T.Co Without
Segregating Its Sources Of Supply, Dempsey Cannot Prove
By How Much Of T.Co's Pipe Was "Out Of Tolerance.".......... 34

b.    The Trans-Port Survey Reports Do Not Furnish A Basis
For Establishing The Amount Of Pipe That Was "Out Of
Tolerance."............................................................... 34

# TABLE OF CONTENTS

Page

(1)    The Material Surveyed At Bolivar And Hooksett Did Not Include Any Of The Steel Shipped On The M/V NORMANDIE V51, All Of Which Dempsey Admits It Processed Without Difficulty. .......................... 35

(2)    Mr. Kuffel's Evidence, When Viewed In Conjunction With All Other Evidence Cannot Establish The Number Of Pieces Damaged. ..................... 38

c.    Dempsey's Own Records Demonstrate That It Suffered No Lost Profits. ........................................................................ 39

(1)    Dempsey Reconditioned The T.Co Supplied Pipe So It Could Be Sold At Prevailing Market Price And Therefore Could Have No Loss Of Profit. .............. 41

2.    Dempsey Cannot Prove The Value Of Its Second Counterclaim: Processing Costs. ..................................................................... 42

a.    There Should Be No Claim For Extra Processing Costs For Pipe Which Was Only Bowed, As Opposed To Bent. ................. 43

b.    Alternatively, The Claim Is Overstated Since Mr. Thypin Was Prepared To Take Back The Defective Material And Straighten It At A Cost To T.Co Of $100 Per Ton. ................... 43

3.    Dempsey Cannot Prove Its Third Counterclaim: "Replacement Steel." ..................................................................................... 44

4.    Dempsey Cannot Prove Its Fourth Counterclaim: Damage To Machinery. ........................................................................... 44

5.    Dempsey Cannot Prove Its Fifth Counterclaim For Storage Charge. ...... 45

III.    CONCLUSION .......................................................................... 45

1.    T.Co Is Entitled To Payment Of Its Outstanding Bills In The Amount Of $338,079.32 Together With Interest At 9 Percent From January 1, 2006 To The Date Of Payment With Costs And Fees ........... 46

2.    Denial Of Dempsey's Counterclaims With Costs And Fees ................... 46

3.    Costs And Fees To Be Determined At A Hearing To Be Scheduled If The Parties Cannot Agree On A Figure Within Days 30 Of This Decision And Award Or Such Other Time As The Arbitrator Deems Appropriate .................................................................. 46

## TABLE OF AUTHORITIES

**Page**

Federal Cases

Atlantica v. Moran Towing & Transp. Co., 498 F.2d 158 (2d Cir. 1974) .................................... 15
B. Lewis Prod. Inc. v. Maya Angelou, 2005 WL 1138474 (S.D.N.Y. May 12, 2005) ................ 14
Bausch & Lomb v. Bressler, 977 F.2d 720 (2d Cir. 1992) ............................................................ 24
Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578 (2d Cir. 1987)................. 15
Brady v. Calyon Sec., 406 F. Supp. 2d 307 (S.D.N.Y. 2005) ....................................................... 20
Candid Prod. Inc. v. Int'l Skating Union, 530 F.Supp. 1330 (S.D.N.Y. 1982)... ......................... 16
East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858 (1986) ......................................... 30
Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,
     343 F.3d 189 (2d Cir. 2003)........................................................................................................ 21
Int'l Minerals & Resources, S.A. v. Pappas, 96 F.3d 586 (2d. Cir. 1996) .................................... 31
Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,
     382 F. Supp. 2d 411 (S.D.N.Y. 2003)........................................................................................ 21
Multi-State Legal Studies, Inc., 899 F. Supp. 1081 (S.D.N.Y. 1995) .......................................... 24
Roneker v. Kenworth Truck Co, 977 F.Supp. 237 (W.D.N.Y. 1997) ..................................... 30, 31
Savage Is Loose Company v. United Artists Theatre Circuit, Inc.,
     413 F. Supp. 555 (S.D.N.Y. 1976) ............................................................................................ 11
Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000)...................................................................... 31
Wullschleger & Co. v. Jenny Fashions, 618 F.Supp. 373 (D.C.N.Y. 1985) ................................ 32

State Cases

Damashek v. Wang Labs., 150 A.D.2d 151 (App. Div. 1989) ....................................................... 32
Delmarva Power & Light Co. v. ABB Power Co., No. Civ. A. 00C-02-175,
     2002 WL 840564 (Del. Super. 2002).......................................................................................... 29
Trinity Indus., Inc. v. McKinnon Bridge Co., Inc., 77 S.W.3d 159 (Tenn. App. 2001).............. 29

State Statutes

N.Y U.C.C. § 2-201(1) (2006) .............................................................................................. 13, 14
N.Y.U.C.C. § 2-209 (McKinney 1964) ........................................................................................ 11
N.Y.U.C.C. § 2-209(2).................................................................................................................. 11
N.Y.U.C.C. § 2-719 ...................................................................................................................... 29
N.Y.U.C.C. § 2-719(1).................................................................................................................. 29
N.Y.U.C.C. § 2-719(2).................................................................................................................. 29
N.Y.U.C.C. 2-715(2) (a), (b) (2006) ............................................................................................ 30
N.Y.U.C.C. 2-715(2)(b)................................................................................................................ 31
NY Gen. Oblig. Law § 15-301 (2006) ......................................................................................... 11

Treatises

1 James J. White & Robert S. Summers, Uniform Commercial Code (5th ed. 2006)............ 29, 31

## I.    **INTRODUCTION**

T.Co Metals LLC ("T.Co") initiated this arbitration against Dempsey Pipe & Supply, Inc. ("Dempsey") for $338,039.72 of steel pipe delivered, accepted, used, processed, and sold, but for which Dempsey refused to pay.

The essential fact is simply stated – Dempsey accepted and used the pipe.

Notwithstanding Dempsey's attempts to befuddle and confuse through the advancement of Counterclaims based upon far-fetched and ever-changing factual and legal theories, the matter remains simple: Dempsey entered into two contracts with T.Co for the sale of goods and, instead of invoking the protections of the contract – and responding to T.Co's repeated requests for information and offers to correct whatever issues Dempsey encountered – simply neglected the contract requirements, ignored T.Co's overtures, and withheld payments.

When pressed to pay for goods accepted, Dempsey Pipe initially attempted to avoid payment by raising concerns regarding T.Co's invoices. When those concerns were proven to be unfounded, but not until the initiation of this arbitration, Dempsey fabricated the ultimate "defense" – an alleged oral contract – that would, at least temporarily, raise a factual question and postpone any immediate requirement that it live up to its contractual obligation to pay overdue bills for the goods used.

Dempsey's "oral compensation agreement" fails as a matter of fact and law. Not only does T.Co deny that it ever entered into an oral compensation agreement, but Dempsey's own conduct refutes that such an agreement was ever made. Ultimately, Dempsey cannot avoid its obligations under the Sales Contracts and the New York Uniform Commercial Code's statute of frauds. Dempsey's attempt to create an "oral compensation agreement" simply cannot withstand scrutiny.

The extent of Dempsey's audacity lies squarely in its claims for damages. First, Dempsey simply ignored its remedies under the Sales Contracts, which, in any event, expressly disclaimed any rights to the consequential damages Dempsey now claims. To the extent Dempsey may have at one point been entitled to some remedy under the Sales Contracts, it waived that right long ago when it processed and sold (instead of rejecting) the allegedly non-conforming material and failed to provide T.Co with the requisite written notice of its claim.

Yet even if the Arbitrator looks beyond the contractual limitations, Dempsey creates a $2 million Counterclaim without a single shred of documentary evidence that it suffered *any* damages. First, Dempsey cannot prove that all of the pipe for which it claims damages came from T.Co. Second, the evidence will show that, while now claiming that every piece of pipe from the M/V ALGARVE, M/V TOSCANA, and the M/V NORMANDIE V54 was damaged,[1] at the time Dempsey never asserted that *more than* 22 to 25 percent of .250 wall pipe was out of tolerance after rejecting the balance of the .188 wall pipe, and then only sought extra processing costs. Indeed, the claim for which Dempsey frantically seeks evidence from third parties – a claim for lost profits – never was an issue to Dempsey previously because Dempsey sold all the T.Co supplied goods at their usual prices. To the extent that the third parties respond, we expect that their evidence will confirm that Dempsey's sales tracked the then-prevailing market.

Thus, Dempsey is crudely and obviously trying to recover from T.Co the consequences of an adverse market. T.Co will establish the adverse turn in the market from Dempsey's own records.

---

[1] See Dempsey's Counterclaim for the contention that every piece of pipe was damaged. Counterclaim at ¶ 62. Also, note from the Counterclaim that Dempsey makes no allowance for the cost of the pipe, a cost it would have incurred if the pipe had been free of any defects.

In short, Dempsey must live up to its contractual obligations under the terms of the Sales Contracts and finally pay its bills. Nor can it recover for failed expectations which market conditions – and not T.Co – induced.

## II.    ARGUMENT

### A.    T.Co Is Entitled To An Award On Its Claim For Unpaid Bills In The Amount Of $338,039.72 With Interest.

#### 1.    Dempsey Must Pay For The Goods It Accepted From T.Co.

This matter began as a simple collection of unpaid bills for pipe Dempsey bought and used. While T.Co sought to enforce the "no withholding" provisions of the two Sales Contracts through the vehicle of an early partial award application, the Arbitrator, in his decision on the Application for Partial Award ("November 22 Decision"), found issues of fact precluding such an award. Yet Dempsey still must pay for the pipe it took and never returned.[2]

The November 22 Decision, however, greatly simplifies T.Co's case. In the course of that proceeding, Dempsey never contested:

(1)    All of the pipe under the contracts had been received;

(2)    None of the product for which T.Co claims payment was returned to T.Co, and;

(3)    The amount T.Co is owed for the pipe it delivered is $338,039.72.

As set forth in the November 22 Decision, Dempsey has paid $1,655,105.81 on invoices totaling $1,993,145.53, resulting in a total outstanding amount of $338,039.72. Nov. 22

---

[2] Even if Dempsey were to be awarded money on its counterclaim, any award must reflect a deduction for the sums Dempsey is holding for T.Co's pipe it received and sold. Damages are intended to make a party whole, and not produce a profit by effectuating a "double dip."

Decision, at ¶ 27.  Thus, T.Co is entitled to be paid on the goods accepted in the amount of $338,039.72, including interest.

Accordingly, it is now clear by Dempsey's own actions that it has no defense to payment and the amount due is $338,039.72.[3]

T.Co therefore will simply incorporate into evidence the bills and delivery documents submitted with its Application for Interim Award, together with the November 22 Decision, and rest its case in chief.  Mr. Thypin's witness statement, submitted with this memorandum, repeats the evidence in support of the amounts due, but because Dempsey never contested the bills in the earlier proceeding, any cross examination on that information is now inappropriate.

### B.    Dempsey's Counterclaims Should Be Denied.

Dempsey cannot prove its Counterclaim.  As to liability, now that the Arbitrator has ruled that T.Co's Standard Terms and Conditions apply, Dempsey's failure to give T.Co notice of the full extent of its damages deprived T.Co of the right to cure as required under the Sales Contracts and precluded any recovery.  Also, the inadequate notice caused T.Co to effect a modest settlement with its supplier based on Dempsey's limited loss determination.  T.Co now has no further recourse against the seller for what are, if anything, manufacturing defects.

Nor can Dempsey prove its damages.  The damages claimed are consequential, and as such, the Sales Contracts bar recovery as does the N.Y.U.C.C.  Furthermore, Dempsey's own documents demonstrate that Dempsey had product from other suppliers in its warehouse and, thus, even if Dempsey had any losses, it cannot prove that T.Co's pipe caused them.  Finally, the evidence will show that even assuming Dempsey can get past the hurdle of identifying T.Co's

---

[3] If the Arbitrator had decided that the interim relief was appropriate, he would have awarded the full $338,039.72 because that figure was not opposed.  The interim proceeding was Dempsey's opportunity to contest the amounts due; the company chose not to do so and cannot do so now.

pipe as that which was defective, the evidence will show that Dempsey sold it at prevailing market prices and incurred no extraordinary costs.

The alleged oral agreement is nothing more than the lately created figment of a fertile imagination. It was never mentioned throughout the entire period of negotiations regarding the resolution of Dempsey's concerns about allegedly defective goods, and T.Co's outstanding invoices, which preceded institution of this arbitration. But, following T.Co's initiation of these proceedings, when it came time for Dempsey to justify non payment of T.Co's bills and confront the clear terms of the Sales Contracts and the N.Y.U.C.C. regarding notice, rejection, and the limitations on liability and damages, the oral agreement burst forth full grown like Venus on the Half Shell.

Dempsey no doubt finds itself in quite a predicament. As will be more fully detailed below, Dempsey's only written notice to T.Co regarding any claim (which was inadequate in any event) identified only 248 defective pieces of pipe out of nearly 14,939 accepted.[4] Furthermore, to the extent Dempsey may have been entitled to a remedy at all, it lost that right by ignoring T.Co's requests for more information about the alleged defects, and T.Co's specific offer to cure. In any event, the Sales Contracts expressly limit T.Co's liability to repairing, replacing or giving a credit for nonconforming goods and precludes consequential damages.

---

[4] As discussed in Section II.E.1.b, *infra*, even if Dempsey can claim the Trans-Port surveys conducted in Bolivar, New York in July 2005, Hooksett, New Hampshire in August 2005, and Walden, New York in October 2005 as "notice," the Trans-Port Surveys are limited in their evaluation of steel pipe to only the M/V ALGARVE and the second voyage of the M/V NORMANDIE ("NORMANDIE V54"). Moreover, the Trans-Port surveys limit the percentage of defective pipe aboard those vessels to that well below the 100% "loss" now claimed by Dempsey. Indeed, Pat Dempsey's own oral claim to T.Co estimated a defective rate of 22%, which was precisely the amount of claim on the .250 wall pipe that Pat Dempsey told Reinhard Kuffel upon Kuffel's first inspection in Bolivar, New York (T.Co. Exhibit 30) and virtually identical to the defective rate of 25% that Pat Dempsey told Kuffel upon Kuffel's second inspection in Hooksett, New Hampshire. T.Co Ex. 36 (TCO 0185).

Finding itself locked into in the foregoing box, Dempsey has fabricated the "oral agreement." But Dempsey's own evidence and the company's conduct prior to these proceedings will prove conclusively that no such agreement ever came into being.

1.     **T.Co And Dempsey Never Entered Into An Oral Compensation Agreement.**

a.     **Mr. Thypin's Denial Of Any Oral Compensation Agreement.**

T.Co denies that there was ever an "oral compensation agreement" between T.Co and Dempsey.

Most importantly, Mr. Dempsey cannot even identify when this supposed agreement was reached. The affidavit he submitted as part of the opposition to T.Co's Application for an Interim Award contained hopelessly contradictory statements. First, he claimed the agreement grew out of a phone conversation with Mr. Thypin in July 2005. Affidavit of Patrick Dempsey ("Dempsey Aff.") at ¶ 26. But later he claims it did not arise until September 2005. *Id.* at ¶ 47.

T.Co does not dispute that Richard Thypin and Patrick Dempsey had a conversation in July 2005 during which they discussed Mr. Dempsey's concerns regarding .188 pipe that T.Co released to Dempsey in late June 2005. Thypin Statement at ¶ 57. Yet there was no discussion of the .250 wall pipe. In fact, even when the surveyor, Mr. Kuffel, went to Bolivar on July 21, 2006, he examined only .188 wall pipe. Indeed, after this conversation, T.Co, acting in good faith, sent a surveyor to Bolivar to look only at the .188 wall pipe. However, at no time during that conversation, or in any other conversation before or since did T.Co and Dempsey enter into an oral compensation agreement. Thypin Statement at ¶ 162. Richard Thypin never promised to compensate Dempsey in return for not rejecting any pipe. *Id.* Furthermore, Mr. Thypin never told Patrick Dempsey to process pipe that would damage his machines. *Id.* at ¶ 63. Finally, at

-6-

no time did Mr. Thypin and Dempsey ever agree to modify or supersede any of the terms of the Sales Contracts. *Id.* at ¶ 162.

Rather, Mr. Thypin's instructions to Patrick Dempsey simply restated the parties' respective rights and obligations under the terms of the Sales Contracts. Specifically, Mr. Thypin advised Patrick Dempsey to process the pipe that he could use and to set aside any pieces that he could not use so that T.Co could replace those pieces or straighten them. Thypin Statement at ¶ 61. Mr. Thypin came away from that conversation under the reasonable impression that Dempsey would proceed accordingly.

There was also a conversation in September 2005. In fact, the principals met and went to the pier on September 12, 2005.

During that meeting, as well as at an additional meeting in Walden, New York at some point in the fall of 2005, Mr. Thypin and Mr. Dempsey discussed Mr. Dempsey's concerns regarding both the .188 pipe as well as new concerns relating to some unquantified portion of the .250 wall pipe. At no point during either of these discussions did Mr. Thypin tell Dempsey to process defective pipe. Thypin Statement at ¶ 113. At no time did Mr. Thypin tell Dempsey that T.Co would provide compensation to Dempsey in return for not rejecting any pipe. *Id.* In fact, Mr. Thypin specifically rejected an offer of compensation in the amount of $18 per ton (which Mr. Thypin later came to understand was actually $18 per piece). Thypin Statement at ¶ 130.

In short, Mr. Thypin's credible statement and testimony refute any claim that there was any oral compensation agreement.

b.    **Mr. Dempsey's Conduct Belies Any "Oral Compensation Agreement."**

Examination of Mr. Dempsey's own conduct proves that there was no oral contract as he now alleges.

Based on Dempsey's own affidavit, the only possible date that any possible agreement was reached was at a meeting with Mr. Thypin in Philadelphia on September 12, 2005, when – according to Dempsey – Mr. Thypin said "let's just go through with it and we'll figure it all out in the end." Dempsey Aff. at ¶ 47. Yet, following September 12, 2005 (the date of the agreement) Dempsey had taken the following steps all of which conclusively refute any notion of an "oral agreement."

After September 12, Dempsey

(1)    continued to accept the remaining 60 percent of the contract quantity;

(2)    never attempted to reject or revoke its acceptance; and failed to respond to T.Co.'s request to be allowed to cure;

(3)    continued to pay (albeit slowly) on T.Co's invoices even though no agreement has been reached with Mr. Thypin on compensation. (*See, e.g.,* Dempsey Aff. at ¶ 45-46);

(4)    stopped making payments on T.Co's invoices in February 2006, but without any reference to the alleged oral compensation agreement;

(5)    never proposed to Mr. Thypin any form of compensation under the alleged agreement;

(6)    had received and accepted about 40 percent of pipe under the Sales Contract; paid for most of it, processed it, and sold it;

Significantly, despite repeated conversations with T.Co in the 12 months between the date of the alleged oral agreement and the date Dempsey filed its Counterclaims on September

15, 2006, Dempsey never once referred orally or in writing to this so called "agreement," or, most importantly, sought to resolve the extent of the compensation due under its supposed terms – a credit against the purchase price. In fact, Dempsey first attempted to avoid payment by alleging certain "discrepancies" in the invoices but never claimed they had an agreement precluding payment.

The abyss separating Mr. Dempsey's allegations from his actual conduct is reminiscent of the statement by John Mitchell, President Nixon's disgraced attorney general that the press and public should "watch what we do, not what we say." Dempsey's conduct during the run up to this arbitration certainly is not that of one with an agreement in hand.

The arbitrator should easily reject any notion that the parties entered an "oral agreement."

### 2.  Even If The Arbitrator Finds That T.Co And Dempsey Entered Into An Oral Agreement, It Is Unenforceable.

In his November 22 Decision, the Arbitrator found four issues of material fact:

(1)    Whether T.Co acted in bad faith in fraudulently inducing Dempsey to enter into the alleged oral compensation agreement;

(2)    Whether the oral modification agreement is unenforceable under the standard terms and conditions of sale, the statute of frauds, or the general obligation law;

(3)    Whether the alleged oral compensation agreement is unenforceable due to being indefinite as to the essential terms of price and quantity, or due to being merely an agreement to agree in the future, and;

(4)    Whether the oral compensation agreement, and any breach/repudiation therefore, affected Dempsey's obligation to pay T.Co's invoices (without setoff).[5]

---

[5] Question 4, as it relates to setoff, appears to be moot given the current posture of the case. Thus, it will not be addressed. To the extent that the Arbitrator deems it still an issue in this arbitration, T.Co will submit additional briefing on this topic.

Nov. 22 Decision at ¶ 70.

In the end, the resolution of each of these issues leads to the same, inexorable conclusion: Dempsey's alleged "oral compensation agreement" is unenforceable.

T.Co will now address the Arbitrator's second and third questions.[6]

### a.   The Oral Compensation Agreement Is Unenforceable Under The Contracts' Standard Terms And Under New York Law.

The Arbitrator's second question was "whether the alleged Oral Modification Agreement is unenforceable pursuant to the no-oral-modification clause in T.Co's Standard Terms and Conditions of Sale, the N.Y. Statute of Frauds or the N.Y. General Obligations Law." Nov. 22 Decision at ¶ 70.

The answer is certainly "Yes" on all counts.

### (1)   Oral Modifications To The Sales Contracts Are Unenforceable Under §1.1 Of The Standard Terms And Conditions.

The Arbitrator has determined that Standard Terms and Conditions were incorporated into the Sales Contracts as a matter of law.  Nov. 22 Decision at ¶ 70.

Section 1.1. of the Standard Terms provides, in relevant part, that:

> The following Conditions shall apply so far as the same are not varied by any special terms or conditions agreed *in writing* between the parties. No variation of the Contract or these Conditions will become binding unless confirmed *in writing* by the Seller and any provisions of the Buyer's order or conditions of purchase which is inconsistent with these Conditions shall be of no effect.  (Emphasis added).

---

[6] T.Co addresses the Arbitrator's first question ("whether T.Co acted in bad faith or fraudulently induced Dempsey to enter into the alleged Oral Compensation Agreement") in Section II.C., *infra*.

This provision is entirely consistent with New York law, and prohibits the enforcement of the alleged oral "compensation agreement."

Under New York law, T.Co and Dempsey were free to bargain for an express, written provision that prohibits the oral modification of the terms of their contract, as set forth in the Standard Terms and Conditions. Two separate, but related statutes echo this principle. First, under NY Gen. Oblig. Law § 15-301 (2006):

> "[a] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement *is in writing and signed* by the party against whom enforcement of the change is sought or by his agent" (emphasis added).

Second, N.Y.U.C.C. § 2-209(2) provides that:

> "[a] signed agreement which excludes modification or rescission except by a signed writing *cannot be otherwise modified* or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party."[7]

(emphasis added). These two statutes are mutually reinforcing. *See The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*, 413 F. Supp. 555, 559 (S.D.N.Y. 1976) citing Buerger and O'Connor, Practice Commentary, N.Y.U.C.C. § 2-209 (McKinney 1964) ("This provision of the UCC is 'consistent with former McKinney's Personal Property Law § 33-c (1), now General Obligations Law § 15-301(1)'").

Thus, the result should not be any different whether the case is governed by the General Obligations Law or the Uniform Commercial Code. If the Arbitrator finds that the alleged oral

---

[7] As noted above, Dempsey is a "merchant," thus it is immaterial whether the no oral modification provision was "separately signed" by Dempsey. Furthermore, the Arbitrator has ruled that the T.Co's Standard Terms and Conditions apply as a matter of law. Thus, the no oral modification provision is in full effect.

-11-

compensation agreement purports to modify the Sales Contracts, it is unenforceable because it was not in writing.

Moreover, the Arbitrator has already rejected Dempsey's patently incredulous argument that it is not a "merchant." Nov. 22 Decision at ¶ 51. Under the N.Y.U.C.C., therefore, any modifications to these Sales Contracts must be in writing.

Dempsey's predicament is clear. If the oral compensation agreement in any way modifies the parties' respective rights and obligations under the Sales Contracts, it is unenforceable if not in writing. Yet, if it does not modify the parties preexisting rights and obligations, then the Sales Contracts (including the terms and conditions) are by definition still in full effect. If, as T.Co argues, the Sales Contracts are in full effect, then all of Dempsey's Counterclaims fail for the reasons T.Co sets forth in this brief, including: Dempsey's failure to provide written notice of its claims, its refusal to permit T.Co to cure, and the contractual limitations on liability and damages. Furthermore, Dempsey is still bound by its obligation to pay for the goods it accepted.

(2)    **The Agreement As Alleged Does Not Satisfy The Statute Of Frauds.**

In addition to violating the plain text of the Standard Terms, any alleged oral compensation agreement or oral modification also violates New York's statute of frauds. Whether the alleged agreement was a modification of the Sales Contracts, or, as Dempsey has previously suggested, an "interdependent" agreement, it is unenforceable if not in writing.[8]

---

[8] Dempsey's counsel argued for the first time at the November 17 hearing that the alleged oral modification agreement was actually a "settlement agreement." Transcript of Nov. 17 Hearing at 22:19-22. Yet, to the extent Dempsey alleges that the alleged "settlement agreement" modifies the parties rights and liabilities under the Sales Contract, especially by changing the Seller's remedies and providing only for a credit against the purchase price, it is a modification of that contract which (under Standard Terms and Conditions §1.1) must be in writing.

The New York statute of frauds provides that:

> A contract for the sale of goods for the price of $500 or more is not
> enforceable by way of action or defense unless there is some
> writing sufficient to indicate that a contract for sale has been made
> between the parties and signed by the party against whom
> enforcement is sought.

N.Y.U.C.C. § 2-201(1) (2006).  Thus, Dempsey's alleged "interdependent" oral contract – a

contract for the sale of goods exceeding $500 – is unenforceable under the statute of frauds.

        (3)     **The Doctrines Of Waiver By Part Performance And
Estoppel Do Not Save Dempsey From The Statute Of
Frauds Because The Parties' Conduct Was Entirely
_Consistent_ With The Terms Of The Sales Contracts.**

During proceedings on the Application for the Interim Award, Dempsey sought to avoid

a ruling that the alleged oral agreement was unenforceable under New York's statute of frauds

by arguing that the part performance of the parties proved the agreement.  Nov. 17 Hearing

Transcript at 35, 52-55.  Yet, Dempsey has the heavy burden of proving that the performance

was "unequivocally referable to the oral modification."  Nov. 22 Decision at ¶ 52.

In fact, the evidence will prove that Dempsey's conduct is _entirely consistent_ with its

obligations under the written agreement and, therefore, Dempsey's attempts to rely upon the

doctrines of partial performance and estoppel fail as a matter of law.

Under the written contract, T.Co was obliged to provide steel pipe to Dempsey and

Dempsey was required to pay for the steel pipe it accepted.  Once it accepted the pipe pursuant to

the written contracts, Dempsey would have processed it and sold it.  By the time of the

discussion between the parties on September 12, 2005, Dempsey had accepted about 45% of the

contract quantities and, on its figures, sold a good portion of the product.  T.Co Ex. 26.  Since it

had accepted this much, and, most importantly, had made no effort at any time to revoke

-13-

acceptance, the record is clear that there was no performance relating to the oral agreement with respect to material already delivered.

Moreover, as explained in Section II.B.1.b., *supra,* after September 12 Dempsey continued as before with no reference to the "oral agreement." Dempsey well understood its rights under the written contracts and elected to proceed with acceptance. In addition, one day after the alleged agreement – September 13 – T.Co wrote Dempsey again asking for the opportunity to cure. Thypin Statement at ¶117 (T.Co Ex 35). If there had been an oral agreement, would not Mr. Dempsey have responded under the terms of that agreement that the remedy was simply a credit against the purchase price?

This history fails to provide any evidence of mutual consent by part performance to any oral modification, let alone "unequivocal" evidence. Indeed, Dempsey's conduct follows the requirements to be expected of a buyer under the written agreements.

b.     <b><u>The Alleged Agreement Is Too Indefinite To Be Enforced.</u></b>

The Arbitrator's third question was "whether the alleged Oral Compensation Agreement is unenforceable due to being indefinite as to the essential terms of price and quantity, or due to being merely an agreement to agree in the future." Nov. 22 Decision at ¶ 70.

The answer again is plainly "Yes."[9]

Under the New York's common law, an agreement is unenforceable unless it is "'definite and explicit so [that the parties'] intention may be ascertained to a reasonable degree of certainty.'" *B. Lewis Prod. Inc. v. Maya Angelou and Hallmark Cards, Inc.*, No. 01 Civ. 0530

---

[9] T.Co's argument for why the alleged oral compensation agreement fails under the N.Y.U.C.C. for lack of essential terms was already set forth in its Reply to Dempsey's Memorandum in Opposition to T.Co's Application for Interim Award (at 7-9). Yet even if the Arbitrator concludes that the N.Y.U.C.C. does not govern, the alleged agreement is too indefinite to be enforced even under New York's common law of contracts.

2005 WL 1138474, at *5 (S.D.N.Y. May 12, 2005) *quoting Best Brands Beverage, Inc. v.*

*Falstaff Brewing Corp.,* 842 F.2d 578, 587 (2d Cir. 1987).  Similarly, it is well-settled that courts

will not enforce a contract where "the terms of the agreement are so vague and indefinite that

there is no basis or standard for deciding whether the agreement had been kept or broken, or to

fashion a remedy, and no means by which such terms may be made certain[.]" *Best Brands,* 842

F.2d 578, 588 (2d Cir. 1987); *see also* 1 Corbin on Contracts § 4.1 ("A court cannot enforce a

contract unless it can determine what it is").  In determining whether an agreement is

enforceable, courts look to whether "their expressions when interpreted in the light of

accompanying factors and circumstances are not such that a court can determine what the terms

of the agreement are." *Restatement (Second) Contracts,* § 33 (1981).  It is not for the court to

"rewrite the contract and impose liabilities not bargained for." *A/S Atlantica v. Moran Towing &*

*Transp. Co.,* 498 F.2d 158, 161 (2d Cir. 1974).

 A term is essential if "it seriously affects the rights and obligations of the parties and

there is a significant evidentiary dispute as to its conten*t.*" *B. Lewis Prods. v. Angelou*, No. 01

Civ. 0530, 2005 WL 1138474, at *6 (S.D.N.Y. April 26, 2005).  There is obviously a "serious

evidentiary dispute" between T.Co and Dempsey as to their respective rights and obligations.

T.Co denies that it is liable at all to Dempsey, and certainly disputes that it ever agreed on a

number of pieces damaged (quantity) let alone on an amount or type of compensation (price).

 The "agreement" Patrick Dempsey describes is totally silent as to *any* term the Arbitrator

may deem to be "essential." According to Dempsey's affidavit, the terms of the alleged oral

agreement were that:

> Dempsey would refrain from exercising its right to reject defective
> pipe sold under the Sales Contracts, in exchange for compensation
> to Dempsey from T.Co for Dempsey's losses and damages that

> would be sustained in connection with completing the purchase,
> processing and re-sale of the defective pipe.

Dempsey's Opp. Memo. to T.Co's App. for Interim Award at 2; *see also*, Nov. 22 Decision at n.

3.

> Dempsey further contends that the parties agreed that:

>> once the extent of the non-conformity was determined by the
>> surveyor, T.Co would adjust the contract price based on (i) the
>> number of pieces of non-conforming pipe that were delivered to
>> Dempsey Pipe, (ii) the number of pieces of non-conforming pipe,
>> and (iii) the number of pieces of non-conforming pipe that
>> Dempsey was able to process, but only at additional processing
>> costs due to the slowdown of processing machinery.

Dempsey Aff. at ¶ 28; *see also* Nov. 22 Decision at n. 3.

Nowhere in Mr. Dempsey's description of the "oral agreement" does he ever allege

negotiation over, let alone agreement upon, a price. Never does he allege negotiation over, let

alone agreement upon, the quantity of defective goods at issue. And there is simply no mention

at all that the nature of the alleged "compensation" was ever discussed, let alone agreed upon.

Of course, Mr. Thypin has stated that no such agreement was ever reached.

There is simply nothing in Mr. Dempsey's description, or the surrounding facts, that

enables the Arbitrator to conclude that the parties actually reached a mutual agreement about

anything specific. At most, the vagueness of the alleged agreement is more suggestive of an

"agreement to negotiate," which is "even more vague than an agreement to agree." *Candid*

*Prod. Inc. v. Int'l Skating Union*, 530 F.Supp. 1330, 1337 (S.D.N.Y. 1982) ("An agreement to

negotiate in good faith is amorphous and nebulous, since it implicates so many factors that are

themselves indefinite and uncertain that the intent of the parties can only be fathomed by

conjecture and surmise").

    (1)    **The Essential Terms Of Price And Quantity Cannot Be Determined By Reference To A Formula, Or Any Other Extrinsic Evidence.**

The Arbitrator, citing *Paper Corp. of U.S. v. Schoeller Tech. Papers, Inc.*, 807 F.Supp. 337 (S.D.N.Y. 1992), has inquired whether the essential terms of the alleged oral compensation agreement "can be determined by reference to a formula, an extrinsic event, previous dealings between the parties, commercial practice, trade usage or market price." Nov. 17 Hearing Transcript at 8:7-21; Nov. 22 Decision at ¶ 58. *Paper Corp.* involved a dispute as to whether the parties had entered into an enforceable contract under which the Buyer was to buy a certain quantity of greeting card paper, at a specific price, exclusively from the Seller. *Paper Corp.*, 807 F.Supp. at 342. When a jury found that the parties had indeed entered into such an agreement, the Buyer moved for a judgment as a matter of law. *Id.* at 340. The court addressed whether a reasonable jury could have concluded that the parties had come to a meeting of the minds on *each* of the essential terms of price, quantity and duration. *Id.* at 342. Based on the record before the jury, the court found that the verdict was reasonable and denied the Buyer's motion. *Id.*

When applied to the facts of *this* dispute, *Paper Corp.* strongly supports T.Co's contention that Dempsey's alleged oral compensation agreement is unenforceable. Unlike in *Paper Corp.*, where there was significant discussion among the parties regarding the terms of the contract, there is no such evidence to suggest that there was ever a meeting of the minds on all essential terms of the alleged oral agreement.

As to the essential term of quantity, the court in *Paper Corp.* found that the jury could have reasonably reached its conclusion that the parties had agreed upon an amount of paper to be sold because the record contained at least five letters in which parties discussed this issue in

-17-

detail. *Id.* at 343. By contrast, in the present dispute, Dempsey has offered not a single shred of evidence (let alone a series of documents written by the parties) even remotely suggesting that it and T.Co had agreed upon a quantity of pipe for which Dempsey was to be compensated. At most, the alleged oral agreement suggests that the parties agreed to *postpone* any agreement on this term until the surveyor's report became available. Even then, Dempsey never alleges that the parties agreed on how to use these reports to determine this essential term. Furthermore, in *Paper Corp.*, the letters on record revealed that the parties only disagreed on the quantity by at most ten percent. Yet in the present dispute, Dempsey is arguing that all but 400 metric tons of the pipe under the Sales Contracts – a whopping 2,040 metric tons (or over 14,000 pieces) – was nonconforming while T.Co maintains that it had notice of only 248 nonconforming pieces or approximately 30 to 40 metric tons. In short, there is nothing even approximating a meeting of the minds between Dempsey and T.Co on the essential term of quantity, and there never has been.

Next, the court determined that there was sufficient evidence of a meeting of the minds because the record contained sufficient evidence of an agreed pricing formula. According to the court, there was sufficient evidence to suggest that this formula contained two specific variables: (1) the price the Seller had to pay for pulp; and (2) a 30 percent profit margin for Seller. *Id.* at 344. The court held that it was appropriate for the jury to find that such a formula satisfied the essential term of price because, under New York law,

> where at the time of the agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice or trade usage.

-18-

*Id.*

      The record in the present dispute is utterly bare of *any* "extrinsic" evidence from which the Arbitrator could ascertain an agreed-upon value of the compensation T.Co allegedly promised to Dempsey. Again, even Dempsey's allusion to the surveyor's report suggest at most an agreement to wait-and-see that (quite unlike the specific numerical formula in *Paper Corp.* ) does not enable one to determine objectively the value of the admittedly missing price term. Moreover, and quite tellingly, not only has Dempsey failed to produce any writings whatsoever that reference this essential term, Dempsey itself has repeatedly changed the measure of its own alleged damages. After all, in its first counterclaim, Dempsey suggested a "formula" based on diminished value. Yet in the November 17, 2006 hearing, Dempsey changed its tune to one of "lost profits." Transcript of Nov. 17 Hearing at 74-76, 88-89, 102-104. Even more dramatically, Dempsey has run away from its proposed estimate of damages of $18 per piece or approximately $200,000 (which T.Co *rejected*), to its present claim for damages totaling some $2,000,000. Thus, it is manifestly clear that, even to this day, Dempsey has never even come to a meeting of the minds with *itself* about the essential price term, let alone with T.Co.

      In the end, the jury in *Paper Corp.* was able to reasonably conclude that the parties had intended to be bound by all essential terms because the parties' intentions could be gleaned from a written record – including many letters and memoranda – the likes of which is simply not present here. Without any evidence at all suggesting (let alone proving) that T.Co and Dempsey agreed to the essential terms of price and quantity, the Arbitrator could not enforce the alleged agreement without inventing those numbers from whole cloth. This is the very essence of the term "unenforceable."

C.   **Dempsey Cannot Find Any Evidence To Support Its Recent Accusations Of Fraudulent Inducement And Bad Faith. T.Co Acted In A Commercially Reasonable Manner In Continuing Its Efforts to Make Good Under The Written Contracts. Only Dempsey Acted In A Commercially Unreasonable Way.**

The Arbitrator's first question was "whether T.Co acted in bad faith or fraudulently induced Dempsey to enter into the alleged Oral Compensation Agreement." Nov. 22 Decision at ¶ 70. Of course, as discussed fully, *supra,* T.Co's primary response to this question is simply that there never was an oral compensation agreement (and hence no inducement). Yet T.Co can also refute Dempsey's accusations without admitting the existence of any oral agreement.

1.   **The Arbitrator's Findings Of Fact Largely Dispose Of Dempsey's Fraudulent Inducement And Bad Faith Accusations.**

The Arbitrator has already disposed of a large portion of Dempsey's false accusation by ruling that:

> Dempsey's failure to learn of the content of T.Co's Standard Terms and Conditions of Sale is no basis for alleging that T.Co . . . behaved in a manner inconsistent with its obligations under the N.Y.U.C.C. to act in good faith with commercial reasonableness.

Nov. 22 Decision at ¶ 46.

First, any suggestion that Dempsey was fraudulently induced presupposes that Dempsey's reliance on the alleged representation was reasonable. *See Brady v. Calyon Sec.,* 406 F. Supp. 2d 307, 316 (S.D.N.Y. 2005) (citing *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Col. of N.Y.,* 375 F.3d 168, 186-87 (2d Cir. 2004) ("A key element of a fraudulent inducement claim is reasonable reliance")); *Gluckman v. American Airlines. Inc.,* No. 92 Civ. 3740, 1994 U.S. Dist. LEXIS 17967, at *6 (S.D.N.Y. Dec. 16, 1994) ("The elements of a fraudulent inducement claim under New York law are 'a material, false representation, an intent

-20-

to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff").

Furthermore, the Arbitrator has ruled that Dempsey is a merchant as a matter of law. This fact belies any suggestion that Dempsey either was or could have been fraudulently induced into the agreement it alleges. *See Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.,* 382 F. Supp. 2d 411, 417 (S.D.N.Y. 2003) (citing *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them").

It would simply not have been *reasonable* for Dempsey to believe that another experienced merchant (Mr. Thypin) had actually agreed – *orally* – to modify the parties' contractual rights so profoundly without some written confirmation. As the Arbitrator has ruled, both T.Co and Dempsey were on notice of all the Terms and Conditions, including the no oral-modification provision and the limitations on liability. Thus, if Mr. Dempsey came away from the conversation on September 12 thinking that Richard Thypin made promises beyond those in the Sales Contracts, it was due to Mr. Dempsey's bad judgment, not Mr. Thypin's bad faith.

    2.    **T.Co Repeatedly Sought To Fulfill Its Obligations Under The Sales Contract, But Dempsey's Inactions In Breach Of Its Obligations Thwarted These Good Faith Efforts.**

Dempsey's accusations of fraudulent inducement and commercial bad faith are entirely discredited when one considers the behavior of the respective parties to this dispute. As Richard Thypin's Witness Statement and the attached documents make clear, T.Co has been more than

fair and reasonable with Dempsey, even when Dempsey was not living up to its responsibilities under the Sales Contracts.

It was certainly commercially reasonable for T.Co to place a hold on the release of material to Dempsey once Dempsey had fallen behind by almost a quarter of a million dollars on its payments to T.Co. *See* Thypin Statement at ¶ 137. And it was certainly an act of good faith for T.Co nevertheless to continue releasing pipe to Dempsey despite Dempsey's continual slow-paying. *Id.* at ¶¶ 138-141. Then, in July, 2005, when Dempsey orally complained that some of the .188 pipe did not conform to contract specifications, T.Co promptly (and in good faith) sent an inspector to Dempsey's Bolivar, New York facility, and in August to Hookset, New Hampshire, to investigate Dempsey's concern.

Indeed, although Dempsey continued to frustrate and compromise the validity of the inspections by processing the very pipe it alleged to be defective, T.Co submitted to three inspections, in three different locations, in order to attempt a good faith resolution to Dempsey's complaint. Furthermore, although it was Dempsey's responsibility under the Sales Contracts to provide T.Co with detailed written notice of its claim (so that T.Co could cure), it was T.Co that took the initiative on this process by repeatedly requesting the information from Dempsey. Yet despite T.Co's repeated efforts, Dempsey never produced the requisite notice sufficiently detailing the alleged defects, and thereby denied T.Co the opportunity to cure under the Sales Contracts.

Finally, despite Dempsey's late payments, interference with the inspection process and repeated failures to provide T.Co with the information it needed to cure, T.Co persisted in its efforts to provide a fair remedy to Dempsey and, in good faith, offered – in writing – to

straighten Dempsey's nonconforming pipe. Yet, once again, T.Co's offer went unanswered. Thypin Statement at ¶¶ 118-119.

These facts alone fully discredit Dempsey's allegations that T.Co acted fraudulently or in commercial bad faith. But the story does not end here.

Mr. Thypin met with Mr. Dempsey on multiple occasions to resolve any problems raised by T.Co, without any obligation to do so. Mr. Thypin met with Mr. Dempsey in Philadelphia on September 12, 2005, and in Walden, New York, also in the fall of 2005. Moreover, Mr. Thypin met with Mr. Dempsey in January, 2006 in Newburgh, New York. Mr. Thypin made multiple efforts to reach out to Mr. Dempsey.

Yet, in February, 2006, Dempsey went from slow payer to non-payer, withholding over $350,000 in payments, alleging "discrepancies" in T.Co's invoices. Dempsey Amended Counterclaims at ¶ 40-41. Assuming Dempsey's proffered excuse was genuine, Dempsey's abrupt refusal to continue paying *even a portion* of its debt certainly showed bad faith, especially in light of the extent to which T.Co had been enduring Dempsey's chronic slow-paying. Furthermore, if Dempsey had been withholding payments because of invoice discrepancies, the commercially reasonable thing for it to have done would have been to resume payments once T.Co resolved the discrepancies. In fact, T.Co *did* resolve Dempsey's questions but Dempsey has, to-date, never paid on its outstanding invoices. Thypin Statement at ¶ 143.

In short, while Dempsey claims that T.Co has acted in bad faith, it is Dempsey, not T.Co that has been commercially unreasonable.

**D.     Dempsey's Counterclaims Are Both Factually And Legally Without Merit.**

1.     **Dempsey Failed To Give T.Co Proper Written Notice Of Its Claim In The Form Required By The Sales Contracts And Dempsey's Breach Of Its Central Obligations In This Regard Prejudiced T.Co Requiring That The Counterclaims Be Barred.**

In his November 22 Decision, the Arbitrator ruled that T.Co's Standard Terms and

Conditions ("Standard Terms") were incorporated into the Sales Contracts as a matter of law.

Nov. 22 Decision at ¶ 70. The Standard Terms provide a detailed notice requirement in the

following language:

> The Buyer shall be deemed to have accepted the Goods and it shall be conclusively agreed that the Goods are in conformance with the Contract unless . . . . [w]ithin *fourteen days* after receipt of the goods and *prior to their use or re-sale*, the Buyer gives *written* notice to the Seller specifying any alleged defect in the quality of state of the Goods or other respect in which the Goods do not accord with the Contract which would be apparent on careful Inspection or by reasonable testing in all the circumstances and thereafter gives to the Seller a reasonable opportunity to inspect or test the Goods before they are used or re-sold.

Standard Terms at §§ 6.1, 6.1.2. (emphasis added).

Failure to provide written notice as required under the Sales Contracts precludes

Dempsey's claim, even if the contractual written notice requirement differs from what is

required under the N.Y.U.C.C. *See Emanuel Law Outlines, Inc. v. Multi-State Legal Studies,*

*Inc.,* 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995) (strictly construing and enforcing contract's

written notice requirement and finding failure to provide written notice precluded the claim); *see*

*also, Bausch & Lomb v. Bressler,* 977 F.2d 720, 724 (2d Cir. 1992) (enforcing contract's 30-day

notice provision).

Dempsey never provided T.Co with the requisite *written* notice alleging defects to the

pipe Dempsey accepted (1) within 14 days of receipt of any shipment and prior to any resale, (2)

specifying the defect, and (3) never offered T.Co the opportunity to cure. The whole purpose of

-24-

notice is to allow the seller to cure.  Dempsey's actions in refusing to give the required notice

precluded T.Co from curing and, based on the quantum of the Counterclaim, aggravated the

losses (assuming there were any).  In these circumstances, Dempsey's Counterclaims are barred

both as a matter of law and under the terms of the Sales Contracts, deeming the goods

conforming in the absence of adequate written notice.

Indeed, the only writing T.Co ever received from Dempsey concerning allegations of

nonconforming goods was a single facsimile from Dempsey, dated August 18, 2005.  *See* Thypin

Statement at ¶ 84.  However, this facsimile failed to satisfy the notice requirement under the

Standard Terms because it did not adequately describe the basis of Dempsey's claim.  After

Dempsey made certain oral allegations that some of the pipe he accepted was nonconforming,

T.Co made a written request of Dempsey to specify *in writing*  "(1) the number of defective

pieces, (2) the degree of deflect (i.e., for example, 2" out of straightness), (3) the location where

we can inspect the defective pieces."  T.Co Ex. 24 (DP01913).

On August 18, 2005, Dempsey responded to T.Co's request with a three line facsimile

stating "(1) No of pcs to Date Approx. 248 (2) Degree of Deflect – wp to 1" (3) Dempsey Pipe –

Hooksett N.H."  T.Co Ex. 25 (TCO 0205).  This ambiguous writing did not constitute adequate

written notice "specifying any alleged defect in the quality of state of the Goods or other respect

in which the Goods do not accord with the Contract" as required by Standard Terms § 6.1.2.

Indeed, immediately upon reviewing Dempsey's inadequate facsimile, T.Co replied with another

written request, this one spelling out in even more detail the specific information T.Co required,

and alerting Dempsey that the information requested was "crucial in order to quantify and

investigate your claim."  Thypin Statement at ¶ 91 (T.Co Ex. 28).   Yet despite T.Co's urging,

Dempsey never responded (either orally or in writing) to this request.

-25-

Thus, Dempsey's sole attempt to provide written notice alleging defects was plainly inadequate under the Standard Terms.[10]

      a.    T.Co Has Been Severely Prejudiced To The Extent That Dempsey Has Failed To Give Adequate Notice Of Its Entire Claim.

Based on Dempsey's minimalist notice, T.Co made a modest settlement of credits against three future purchases, the first two in the amount of $10,822, and a final in the approximate amount of $13,672.41, with the supplier (Cintac) and cannot now reopen that claim.[11] There.is no dispute that the damage originated in the manufacturing process. T.Co, as a distributor of someone else's product should have recourse against the manufacturer, but is now precluded because Dempsey would not reveal the losses he now claims. As a result of Dempsey's default, T.Co has no remedy. For this reason alone, Dempsey's claims beyond the 248 pieces it had identified should be barred.

---

[10] Alternatively, if the Arbitrator rules that Dempsey's August 18, 2005 facsimile satisfied the written notice requirement of §6.1.1, T.Co argues that it should only be charged with notice of at most 248 nonconforming pieces of pipe (of unspecified size), and that Dempsey's remedy, if any, should be limited accordingly. Furthermore, to the extent that T.Co can be charged with any notice at all, T.Co was not on notice of the full extent of Dempsey's claims until the November 22, 2006 hearing on T.Co's Application for Partial Award. To the extent Dempsey argues that the surveys are adequate notice, we discuss below at II.E.1.b., the inadequacy of the surveys for purposes of establishing Dempsey's loses. The surveys in any event do not address the fact that Dempsey still breached the provisions of the contract requiring it to give T.Co the opportunity to cure by failing to respond to T.Co's September 13, 2005 offer to straighten. T.Co also observes that the lack of notice from an experienced "merchant" certainly entitles T.Co to an inference that there was no further damage. In this regard, T.Co notes that Dempsey also did not mention any significant losses to Mr. Schrumpf of Prime Metal, T.Co's agent for the sales. Schrumpf Witness Statement at ¶¶ 22, 23, 25.

[11] To date, T.Co has only received one credit of $10,822 from Cintac. Thypin Statement at ¶ 132.

2.    **The Sales Contracts, And Even The Alleged "Oral Agreement" Bar The Damages As Now Claimed.**

    a.    **Dempsey Itself Valued The Claim At No More Than $18 Per Piece, Or $269,902.**

Dempsey's Counterclaims bear no relationship to Dempsey's own contemporaneous evaluation concerning the quantum of its loss.

Dempsey eventually offered to settle its dispute with T.Co for $18 per piece of pipe covered by the Sales Contracts. Pursuant to the Sales Contracts, Dempsey accepted 14,939 (which excludes the .188 wall pipe ultimately rejected by Dempsey), thus Dempsey had valued its damages at $268,902. It is only reasonable to assume that Dempsey, an experienced merchant, intended its $18 per piece estimate to include all of the damages it believed it was incurring, including diminished value, processing costs, damage to machinery, and cover. Therefore, it is clear that Dempsey's current Counterclaim for nearly $2,000,000 is yet another litigation fabrication that should be rejected.[12]

3.    **Factually, The Damage Claim Fails Because As Stated It Is Not In Accordance With The Terms Of The Alleged "Oral Agreement."**

Both the alleged "compensation agreement" and the written contracts limit any losses Dempsey can claim.

    a.    **The "Oral Agreement" Does Not Allow The Losses Dempsey Now Claims.**

Dempsey has itself characterized the "oral agreement" as a "settlement agreement." Nov. 17 Hearing Transcript at 22:19-22. But the "settlement agreement" limited any recovery to an adjustment of the contract price.

---

[12] Ironically, this proposal can be seen as entirely in accord with the written contract providing that the buyer be given a "credit" for defective material and further proof that Dempsey well understood that he was selling the T.Co supplied pipe at market with no loss on the resale.

If the Arbitrator finds there is an "agreement" then *all* of its terms must be enforced. One of these terms limited the damages for what T.Co would be liable. In Mr. Dempsey's own words, as set out in the affidavit he executed in conjunction with the opposition to T.Co's Application, he stated that T.Co would "adjust the contract price" based on the number of non-conforming pieces that could not be processed and those that could not be processed but at an increased cost. Dempsey Aff. at ¶ 28; *see also* Nov. 22 Decision at n. 3.

Dempsey's claim for damages brazenly fails to follows the terms it asserts were part of the supposed "oral agreement" but never suggests an appropriate adjustment to the contract price.[13]

If there was a "settlement agreement" all its terms must be enforced. Dempsey cannot "cherry pick" only those it now finds useful.

> **4.    The Sales Contracts Expressly Limits T.Co's Liability, And Does Not Hold T.Co Liable For Any Of The Remedies Dempsey Seeks In Its Counterclaims.**

Section 7.4 of the Standard Terms expressly limits T.Co's liability by granting T.Co the sole discretion whether to repair or replace the goods in question or to provide Dempsey with a credit or repayment on a proportion of the Contract price for nonconforming goods, stating:

> Where any valid claim in respect of any of the goods which is based on any defect in the quality or condition of the Goods or their failure to meet specification is notified to the Seller in accordance with these Conditions, the Seller shall be entitled to replace the Goods (or the part in question) or, at the Seller's sole discretion, credit the Buyer with the Contract price of the Goods (or a proportionate part of the price), *but the Seller shall have no further liability to the Buyer.* (Emphasis added).

---

[13] As established *infra* in Section II.E.1., Dempsey cannot prove that goods T.Co delivered were defective because its inventory system does not allow the company to trace goods from any given supplier.

The Standard Terms further underscore this limitation on liability by providing that:

> The undertakings in condition 7.4 herein are given *in lieu of any other legal remedy* and the liability of the Seller shall be for all purposes limited to the giving of any appropriate credit or repayment or replacement in accordance with that Condition. *Under no circumstances* shall the Seller be liable (save in respect of non-excludable statutory liability) for any other loss[,] damage or expense whatsoever occasioned by any breach of contract, negligence or breach of any duty of the Seller whatsoever and howsoever such loss, damage or expense may have been caused.

Standard Terms § 7.5 (emphasis added).

In addition, the section on "Claims" in the written agreement plainly states that "[T.Co] is not responsible for consequential loss or damage."

Dempsey's five Counterclaims are for "diminished value of accepted goods," "processing costs," "cost of additional pipe purchased," "repair of damaged machinery," and "storage costs," respectively. *See* Dempsey Amended Counterclaims and Answer at ¶¶ 56-91. Each of these Counterclaims seeks damages that are well beyond the scope of any liability T.Co assumed under the Standard Terms. Put another way, when Dempsey signed the Sales Contracts, it waived its right to bring a claim for anything other than replacement, repair or credit for nonconforming goods it accepted.[14]  Furthermore, all of the items of the Counterclaims, except the storage costs, are excluded consequential damages.

By limiting T.Co's liability to replacing, repairing or providing credit for nonconforming goods, the Standard Terms do not disclaim any "non-excludable statutory liability."  Rather, such a limitation on liability is entirely consistent with N.Y.U.C.C. § 2-719, which governs contractual modification or limitation of remedy.  This provision provides, in relevant part, that:

---

[14] Under §7.4 the Seller is not liable to the Buyer unless the Buyer's claim is "notified to the Seller in accordance with these Conditions."  T.Co's duty to compensate Dempsey thus never attached because, as T.Co argues in Section II.D.1, *supra,* Dempsey never provided timely, written notice of its claim.

the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, *as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts*[.]

N.Y.U.C.C. § 2-719(1) (a) (emphasis added).

The limitation on liability in T.Co's Standard Terms and Conditions §§7.4-7.5 are thus not "non-excludable" by statute, but rather are expressly permitted.[15]

> **5.      To The Extent That Dempsey's Counterclaims Are For Consequential Damages, They Are Expressly Disclaimed In The Sales Contracts As Permitted Under The N.Y.U.C.C.**

Dempsey's demands to be compensated for alleged diminished value, cost of additional pipe purchased, processing costs, and damage to its machinery are all claims for consequential damages, and as such, are expressly disclaimed in the written Sales Contracts providing that "seller is not responsible for consequential loss or damages." Sales Contracts at "CLAIMS" section.

Under New York law:

> Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any <u>breach of warranty</u>. (emphasis added)

---

[15] To the extent Dempsey may argue that this limited remedy "fails of its essential purpose" under N.Y.U.C.C. § 2-719(2) and that it is, therefore, entitled to remedies under the N.Y.U.C.C., T.Co maintains that any such failure of purpose would be the result of *Dempsey's* own conduct. "The buyer must provide the seller a reasonable opportunity to carry out the exclusive or limited remedy before the buyer can successfully argue failure of essential purpose." 1 James J. White & Robert S. Summers, <u>Uniform Commercial Code 830 (5th ed. 2006)</u> (citing *Trinity Indus., Inc. v. McKinnon Bridge Co., Inc.,* 77 S.W.3d. 159, 170 (Tenn. App. 2001) (holding that "[a] fair and adequate remedy not invoked by the buyer cannot be said to fail of its essential purpose"); *Delmarva Power & Light Co. v. ABB Power T & D Co.,* No. Civ. A. 00C-02-175 WCC, 2002 WL 840564, at *5 (Del. Super. 2002) (finding that remedy did not fail of essential purpose because numerous attempts to repair were required)). Dempsey not only never availed itself of the remedies available to it under the Sales Contracts, but also repeatedly frustrated T.Co's ability to provide those remedies.

N.Y.U.C.C. 2-715(2) (a), (b) (2006).

It is clear from New York's statutory and case law that most of Dempsey's Counterclaims are demands for consequential damages.[16]  Although Dempsey's First Counterclaim seeks "Diminished Value," Dempsey appears to have recast it as one for "lost profits." *See* Transcript of Nov. 17 Hearing at 74-76, 88-89, 102-104.  Lost profits are clearly consequential damages, and T.Co is not liable for them under the Sales Contracts.  *See, e.g,* *Roneker v. Kenworth Truck Co,* 977 F.Supp. 237, 240 (W.D.N.Y. 1997) ("In essence, consequential damages are economic losses, such as lost profits"); *East River S.S. Corp. v. Transamerica Delaval,* 476 U.S. 858, 874 (1986) ("The limitation in a contract action comes from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach"); *Schonfeld v. Hilliard,* 218 F.3d 164, 176 (2d Cir. 2000). ("The type of consequential damages most often sought is lost operating profits of a business . . . . [h]owever, lost profits are not the only kind of consequential damages"); *Int'l Minerals & Resources, S.A. v. Pappas,* 96 F.3d 586, 597 (2d. Cir. 1996) ("Consequential damages include recovery for lost profits, which must be proven with reasonable certainty"); 1 James J. White & Robert S. Summers, Uniform Commercial Code 724 (5th ed. 2006) ("The most commonly litigated and doubtless the most sought after type of consequential damages is lost profits").

Even though it refers to them as "incidental damages," Dempsey actually makes a claim for consequential damages in its Second Counterclaim, which seeks remuneration for increased

---

[16] As discussed more fully below, T.Co maintains that Dempsey's Third Counterclaim (for "replacement pipe") should not be read as a viable claim for damages at all. T.Co maintains that Dempsey did not order this pipe as "cover," but rather as additional pipe to sell beyond the pipe ordered under the Sales Contract.

costs Dempsey allegedly incurred in the processing of the pipe it accepted from T.Co. Assuming arguendo that Dempsey actually incurred these expenses, they are precisely the types of "increased costs incurred as a consequence of the breach" that the courts consider consequential damages. *Roneker,* 977 F.Supp. at 240.

Dempsey's Fourth Counterclaim ("damage to machinery") is also for consequential damages. The N.Y.U.C.C. clearly provides that damage to personal property is a form consequential damage. N.Y.U.C.C. 2-715(2)(b) (consequential damages include "injury to person or property proximately resulting from any breach of warranty"). Furthermore, the Code provides that a buyer can only recover such consequential damages when the breach proximately caused the damage. *Id.; see also Id.* Official Comment 5 (stating that the buyer himself, and not the breach, is the proximate cause of the damage "[i]f it was not reasonable for him to [use the goods] or if he did in fact discover the defect prior to his use"); *see, e.g., Oak Point Assocs. v. Norkin,* 1994 U.S. Dist. LEXIS 6912 at *36 (S.D.N.Y., May 4, 1994) (finding no recovery for breach of warranty "absent a showing by the buyer that the breach was the proximate cause of the damages."); *Damashek v. Wang Labs.,* 150 A.D.2d 151, 152 (App. Div. 1989) (citing to U.C.C. § 2-715(2)(b) for the proposition that there can be no recovery for breach of warranty without proof that the damages were proximately caused by the breach); *Wullschleger & Co. v. Jenny Fashions,* 618 F.Supp. 373, 376 (D.C.N.Y. 1985). As argued more fully in Section II.E.4, *infra,* Dempsey ignored T.Co's request that it set aside any pipe that it could not process, thus Dempsey, not T.Co, was the proximate cause of any damage to its machinery.

**E.    Dempsey Cannot Substantiate Any Of The Damages It Seeks.**

Quite apart from the insurmountable barriers to recover of the damages claimed which

the written contracts, the N.Y.U.C.C. and even the "oral agreement" have erected, Dempsey's

evidence cannot prove the quantum of the company's supposed losses.

> 1.    **Dempsey Cannot Prove That Any Of The Pipe It Purchased From T.Co Caused Any Damages Because Dempsey Cannot Trace The Material Through Its Inventory, Which Included Material From Other Suppliers.**

Dempsey appears to have no system in place to trace the materials it buys from the time

the goods arrive at its warehouse deck through the delivery to its customers.

Again, T.Co. submitted the following document requests to Dempsey:

> 1.    All inventory records related to the receipt of pipe received by Dempsey under Sales Contracts 2094 and 2095.
>
> 2.    All inventory records related to the shipment to Dempsey's customers of pipe received by Dempsey under Sales Contracts 2094 and 2095.
>
> 3.    All inventory records related to the processing of pipe received by Dempsey under Sales Contracts 2094 and 2095.
>
> 4.    All inland bills of lading showing receipt of pipe received by Dempsey under Sales Contracts 2094 and 2095 at Dempsey's operating locations.
>
> 5.    All inland bills of lading showing the shipment to Dempsey's customers of pipe received by Dempsey under Sales Contracts 2094 and 2095.

Dempsey produced nothing in response to items 4 and 5, thereby confirming that it

cannot trace materials through its warehouse to its customers.[17]

It appears that as Dempsey receives the bundles, they are left intact and placed into the

inventory.  There is no evidence that the inventory is segregated by supplier and records kept of

---

[17] Nor do the figures distinguish between inventories in Bolivia and Hooksett, N.H.  The T.Co materials were delivered to both facilities.

-33-

that segregation. Then, when Dempsey is ready to process the pipe, the bundles are broken open and each piece loaded on a threader. No record is kept of the individual piece. It appears no records are kept of the processing because Dempsey did not produce any such evidence. Once the threading is completed, the individual pieces are placed into the warehouse inventory, and no record of each piece of pipe's origin is kept. Thus, Dempsey cannot determine which pieces were "out of tolerance" and shipped to its customers.

a.    **Because Dempsey Processed And Sold Material Well In Excess Of The Quantity Received From T.Co Without Segregating Its Sources Of Supply, Dempsey Cannot Prove By How Much Of T.Co's Pipe Was "Out Of Tolerance."**

The inventory records Dempsey supplied T.Co in response to discovery requests 1-3 disclose that, during the period between May 12, 2005 and February 10, 2006, T.Co supplied Dempsey with 283,940 feet of .250 wall pipe, but Dempsey sold 373,237 feet of this product during this same period. Thypin Statement at ¶ 178.

Each of Dempsey's Counterclaims, except for the extra storage costs, depends on Dempsey's ability to prove that the T.Co pipe -- and not that of some other supplier -- was out-of-tolerance. With no ability to segregate nearly 90,000 feet of material received from other suppliers, the Arbitrator should conclude that Dempsey has failed to carry its burden of proving its losses with reasonable certainty because Dempsey cannot prove that its supposed losses arose from T.Co supplied material and therefore should deny all of the Counterclaims, except the storage costs, for the failure of proof.

b.    **The Trans-Port Survey Reports Do Not Furnish A Basis For Establishing The Amount Of Pipe That Was "Out Of Tolerance."**

The only documentation Dempsey has produced purporting to assess the amount of material that was "out of tolerance" is found in the reports of the surveyor, Mr. Reinhard Kuffel.

-34-

Mr. Kuffel was appointed by T.Co to examine the pipe when Dempsey registered its only complaint. Dempsey has no evidence of its own.

Mr. Kuffel made three examinations. The first was in Bolivar, New York; the second at Dempsey's Hooksett, New Hampshire facility; and the third at Prime Metal in Walden, New York to demonstrate the losses to Cintac, T.Co's supplier. *Yet none of these surveys are sufficient to prove any of Dempsey's alleged damages.* Dempsey supplied culls – left overs from what it had received – for examination. These culls cannot be considered representative.

> **(1)    The Material Surveyed At Bolivar And Hooksett Did
> Not Include Any Of The Steel Shipped On The M/V
> NORMANDIE V51, All Of Which Dempsey Admits It
> Processed Without Difficulty.**

The M/V ALGARVE was the second of the four vessels to deliver pipe under T.Co's two contracts with Dempsey. The M/V NORMANDIE V51 had already delivered 400 metric tons of .250 wall pipe that Dempsey accepted as within tolerances and processed without difficulty. T.Co Ex. 30 (TCO 0167). The M/V ALGARVE delivered 141 metric tons of .188 pipe, 620 metric tons of .250 wall, and 100 metric tons of .280 pipe. Subsequent to the M/V ALGARVE, the M/V TOSCANA discharged 405 metric tons of .250 wall pipe and the M/V NORMANDIE V54 delivered 770 metric tons of .250 wall pipe. T.Co Ex. 12 (TCO 0558).

But, as discussed elsewhere, because Dempsey never complained about materials from the M/V TOSCANA, no joint survey of that material ever took place. Thus, the surveys cannot be considered as establishing the loss on the later vessels. Moreover, because Mr. Kuffel attributed the "out of tolerance" condition to manufacturing defects, it is difficult to see how the material from the M/V NORMANDIE V51 could be "out of tolerance" when the balance was not and all the material came from the same supplier.

(a)     **The Survey At Bolivar**

Mr. Kuffel surveyed material at Dempsey's Bolivar, NY facility on July 25, 2005.

Details of the survey and his findings are found in Mr. Kuffel's statement. Significantly, he

inspected only a few pieces of .188 wall pipe. He reports that Dempsey had only taken delivery

of 17 bundles, or one truckload. This, of course, is consistent with the overall facts because

Dempsey had rejected 122 of the 141 metric tons shipped. Of the 17 bundles, Dempsey had

received (119 pieces), Dempsey had processed and sold 104 pieces (*See* T.Co. Exhibit 30)

leaving only 14 pieces culled from the 17 bundles for inspection. Mr. Kuffel found all 14 to

have a bow of .375 to .500 inches over the 20 feet length. This is out of the ¼ inch by ⅛ to ¼

inch. Since Dempsey is regularly selling pipe that has no tolerances for straightness, the

condition of this pipe should therefore have posed no difficulty in processing. In addition he

found "20-30% of the pipe with a bend at one end." *Id.*

Considering the small sample and the manner in which Dempsey selected the sample, it

cannot be representative.

Most importantly Dempsey's records reveal that even this pipe was sold at market price

several months later.

(b)     **The Survey At Hooksett**

Mr. Kuffel attended at Dempsey's Hooksett facility on August 24, 2005. Of the 620.486

metric tons of .250 wall pipe from the M/V ALGARVE, or approximately 4,000 pieces,

Dempsey showed Mr. Kuffel the equivalent of six bundles or 42 pieces. Again, as at Bolivar, 21

pieces were not in their original bundles and were culls from 574 bundles. T.Co Ex. 30

(TCO 0167).

-36-

None of the 21 loose pieces met the ¼ inch straightness requirements. Of the three intact bundles or 21 pieces, Mr. Kuffel reported that some in bundle 93 met the straightness requirement. But, for the most part, the out of straightness pieces were met or were close to the .48 inch specification in API 5L.

Mr. Kuffel did not find the bending at the ends reported with response to .188 wall pipe he had surveyed in Bolivar, New York. Nor do the photographs from Hooksett show the bending as opposed to the bow.

Again, because of the manner in which Dempsey selected the material and the small number of pieces, the survey results cannot be deemed representative. Also, there is no evidence that even these pieces ultimately were not sold at market prices.

This survey does not support Dempsey's claim.

(c)    <strong><u>The Survey At Walden</u></strong>

On October 12, 2005, Mr. Kuffel attended a survey at the Prime Metal premises in Walden, NY. The purpose of this survey was to demonstrate the damage to Cintac, T.Co's supplier in order to facilitate a settlement of T.Co's claim for furnishing off specification product. Witness Statement of Peter Schrumpf ("Schrumpf Statement ") at ¶ 28.

Dempsey shipped .250 wall pipe to Prime for this inspection. The shipment consisted of 15 loose pieces and one intact bundle. Again, this was material from the M/V ALGARVE, and according to handwritten notes, based on the heat numbers, some material from the second voyage of the M/V NORMANDIE. The M/V ALGARAVE included 828 bundles, or 5,796 pieces. TCO 0558. The M/V NORMANDIE shipment contained 711 bundles consisting of 4,977 pieces.

-37-

Sixty percent of the loose material met the straightness requirement and four of seven

pieces in bundle 184 were "in tolerance." All met or just exceed .48 inch requirement of API 5L.

"Several" pipes also showed a bend at one end. T.Co Ex. 36 (TCO 0185).

Since Dempsey selected the leftovers from at least 10,773 pieces, this survey cannot be

representative either.

Following the survey, Prime Metal shipped all of the pipe back to Dempsey. Again, there

is no evidence that Dempsey did not sell this material at market price.

The Walden survey does not prove Dempsey's losses.

(2)     **Mr. Kuffel's Evidence, When Viewed In Conjunction
        With All Other Evidence Cannot Establish The Number
        Of Pieces Damaged.**

Both T.Co's sale of the rejected .188 wall pipe to Morris Industries at only .25 cents per

foot (¼ cent) less than the contract price to Dempsey and the compliance with all specifications

of the .250 wall materials received from the M/V NORMANDIE V 51 combine to require a

finding that Dempsey simply has not carried its burden of proving how much of the material it

bought from T.Co failed to meet contract specification.

(a)     **The Sale to Morris Industries**

After Dempsey rejected about 122 metric tons of .188 material, T.Co was able to sell this

material to Morris for only .25 cents per foot less than the contract price to Dempsey.

Moreover, Morris took the material without protest or complaint and resold it without difficulty.

Thypin Statement at ¶ 158.

These 122 metric tons equates to approximately 483 pieces. This successful sale to

Morris should be seen as substantial and persuasive proof that the mere 14 pieces shown to Mr.

Kuffel at Bolivar were atypical of the entire shipment.

-38-

The few out-of-specification pieces shown to Mr. Kuffel should be regarded as the damage ordinarily to be expected in a shipment of this magnitude.  Schrumpf Statement at ¶ 20.

        (b)    **Compliance Of Materials From The First Voyage Of The M/V NORMANDIE V 51.**

Dempsey has stated that the 400 metric tons of .250 wall pipe or approximately 2,825 pieces delivered from the M/V NORMANDIE V 51 met the contract specifications.  Yet, Dempsey claims that 100 percent or every one of over 14,000 pieces from the subsequent three shipments failed to comply with the contract specifications.

Mr. Kuffel, the surveyor on which Dempsey is relying, noted that the out of specification bow is regarded as "deficiencies related to manufacturing…" and suggested "a wider spread problem instead of problem limited to a small batch of production due to a temporary malfunction."

If indeed the problem is a wider production problem, Dempsey must explain why it found the original 400 metric tons in compliance with the specifications.  No such explanation has been forthcoming.

        c.    **Dempsey's Own Records Demonstrate That It Suffered No Lost Profits.[18]**

As part of its documentary discovery, T.Co sought the following:

14.    All invoices to and all records of payment by customers for the pipe received by Dempsey under sales contracts 2094 and 2095.

15.    All invoices to and all records of payment by customers for 6x.250 wall, 6 x .188 wall and 6 x .280 wall pipe received

---

[18] Initially, Dempsey claimed "diminished value" (*see* First Counterclaim), but by the time of the November 17 hearing, this theory was abandoned in favor of a "lost profits" analysis. *See* Transcript of Nov. 17 Hearing at 74-76, 88-89, 102-104. We also understand that lost profits based upon the prevailing market is the point of the three subpoenas Dempsey has issued. Our analysis of the damages therefore proceeds on a lost profits basis.

by Dempsey from other vendors between January 1, 2005
and February 28, 2006.

16. All sales contracts with customers for the sale of 6 x .250
wall, 6 x .188 wall, and 6 x .280 wall pipe from January 1,
2005 to February 28, 2006.

In response to the above requests, Dempsey produced only summaries of its sales.

Dempsey began receiving pipe from T.Co on May 12, 2005 and received its last shipment on

February 1, 2006.

Based on Mr. Thypin's analysis of the summaries Dempsey has produced, the average

price Dempsey realized for its sale of the 6 inch x .250 wall, 20-foot, threaded and coupled

material between January 1 and May 1, 2005, ranged from $8.70 to $10.35 per foot. *See* T.Co

Ex 62. This was the period before Dempsey started receiving any T.Co product.

After May 1, 2005, in a declining market, the price ranged from $8.10 to $10.00 per

foot.[19] *Id.*

Dempsey's own evidence proves that Dempsey sold whatever it had at prevailing market

prices and suffered no loss. Indeed, it appears from Dempsey's own records, which include sales

of material that T.Co did not supply, that during the summer and fall of 2005 the market declined

and that the reversal of the market – and not T.Co's materials – disappointed Dempsey's

expectations.

---

[19] We recognized that Dempsey has outstanding subpoenas to three other pipe suppliers. Even if Dempsey is able to
prove that figures produced from these companies and the markets are comparable, we have every reason to believe
that the numbers will only match those from Dempsey's own records. The fungible nature of this material dictates
that market place will dictate a uniformity of pricing. There is no reason that one supplier can command a higher
price than its competitor when the goods are fungible. Indeed, Dempsey's counsel admitted that Dempsey cannot
sustain its burden and thus is not entitled to recover no loss of profit when he in effect conceded that without the
subpoenaed materials he could not prove a loss. Nov. 17 Hearing Transcript at 113, 118.

(1) **Dempsey Reconditioned The T.Co Supplied Pipe So It Could Be Sold At Prevailing Market Price And Therefore Could Have No Loss Of Profit.**

Dempsey has submitted a claim of for $583,744 for the cost of reconditioning the pipe it claims was "out of tolerance." *See* Dempsey Amended Answer and Counterclaims at ¶ 74. Yet Dempsey cannot prove that despite the reconditioning the sale of the pipe did not yield full value.

We expect the evidence from Dempsey will show that the pipe for which extra processing costs are claimed was put back into inventory and shopped as sound material, thus commanding full market value. Therefore, Dempsey's evidence will be that it incurred the reconditioning costs in order to realize the full value of the material.

Further proof that the alleged condition of the goods after the reconditioning did not cause any loss to Dempsey may be found in the complete lack of rejections or customer complaints arising out of Dempsey's shipment of T.Co supplied pipe to its customers. Again, Dempsey's response to T.Co's request for documents conclusively proves the point.

T.Co requested the following:

11. All customer rejection reports issued by Dempsey for January 1, 2005 to February 28, 2006 relating to the pipe received by Dempsey under sales contracts 2094 and 2095.

12. All customer credits issued by Dempsey from January 1, 2005 to February 28, 2006 relating to the pipe received by Dempsey under sales contracts 2094 and 2095.

Dempsey provided no documents in response to the above requests. The pipe T.Co supplied was therefore acceptable in the market and Dempsey realized full value for this material.

**2.    Dempsey Cannot Prove The Value Of Its Second Counterclaim: Processing Costs.**

In its Second Counterclaim, Dempsey insists that it is entitled to $583,744.00 in "incidental damages" it allegedly incurred processing the pipe it accepted from T.Co. Dempsey bases this dollar amount on the unsubstantiated assertion that it cost Dempsey $56.25 to process each piece of allegedly defective pipe (or $43.75 more per piece than Dempsey "generally charges its customers"), a total of $538,693.75. Dempsey then claims another $45,050 for the "additional man hours for shipping and other trucking costs" Dempsey claims it was incurred because it had to ship some of the pipe to its Bolivar, New York plant for processing.[20]

Yet Dempsey has not, and *cannot* prove that it is entitled to any such damages, because Dempsey does not (1) trace the material through its processing procedures; and (2) maintain adequate records of its processing costs.

Dempsey has no records relating particularly to processing. T.Co requested the following:

6.    All records of logs and of processing of the pipe received by Dempsey under Sales Contracts 2094 and 2095, including, but not limited to, direct references to the specific lots shipped under the contracts showing mill identification, vessel name, bill of lading number, and voyage number.

7.    All records relating to time spent processing each lot of pipe received by Dempsey under Sales Contracts 2094 and 2095.

8.    All records and logs of the processing of all 6 x .250 wall, 6 x .188 wall, and 6 x .280 wall pipe from any source at each of Dempsey's locations from January 1, 2005 to February 28, 2006.

---

[20] To the extent that Dempsey "had to" ship some of the pipe to Hookset because its machines at Bolivar could not process "the most defective" pipe, T.Co was unaware of the limitations on Dempsey's machines and thus these expenses are quintessential consequential damages.

No documents were produced in response to these requests. Without such documentation, Dempsey cannot begin to prove its claim for additional processing costs.

### a. There Should Be No Claim For Extra Processing Costs For Pipe Which Was Only Bowed, As Opposed To Bent.

T.Co has requested specifications for the threaders relating to the straightness of the pipe, but Dempsey has yet to produce any. Because the ordinary specifications often have no requirements for straightness, it seems reasonable to assume that the machinery could process such material without any delay. Thus there can be no claim for extra costs for processing pipe that is not perfectly straight when processing such material is part and parcel of Dempsey's business. The condition of T.Co's pipe was typical of that Dempsey processed and there as been no extra processing costs.

### b. Alternatively, The Claim Is Overstated Since Mr. Thypin Was Prepared To Take Back The Defective Material And Straighten It At A Cost To T.Co Of $100 Per Ton.

Dempsey, in refusing to discuss with Mr. Thypin the extent of the damages or give him the opportunity to cure, has failed to mitigate the losses. Mr. Thypin had a proposal from Prime Metal to straighten the pipe at a cost of $100 per ton. Schrumpf Statement at ¶ 46. Assuming on Dempsey's claim that all of the material was defective, that is about 2,000 tons at $100 per ton, the maximum reconditioning costs (assuming an unsupported 100% defective rate) would amount to $200,000.[21]

Dempsey's failure to mitigate precludes the claim asserted.

---

[21] As noted, to the extent that Dempsey can overcome the notice, documentation, limitation on liabilities and other such legal issues, the reconditioning costs of $100 shall be applied to only 22 percent of 2,000 tons, or $44,000.

-43-

### 3. __Dempsey Cannot Prove Its Third Counterclaim: "Replacement Steel."__

In its Third Counterclaim, Dempsey demands $119,482.00 for "costs of additional pipe purchased." Dempsey Amended Answer and Counterclaims at ¶ 77. Dempsey claims that it was "forced to purchase [this] additional pipe to cover its requirements." *Id.* at ¶ 76.

It is clear that Dempsey did not purchase this additional steel as "cover," but rather as additional material it desired to satisfy obligations outside the Sales Contracts. Since its earliest dealings with T.Co, even before the parties entered into the Sales Contracts, Dempsey had been seeking additional steel from T.Co and other sources. Thypin Statement at ¶ 27. Indeed, Dempsey continued to buy steel from other sources, including *before* any issues arose between the parties. Schrumpf Statement at ¶ 17.

Thus, the expenses Dempsey incurred to obtain this extra steel were not "damages" at all, because they were not the result of any breach by T.Co of its contractual or legal duties. Rather, they were simply additional business expenses that Dempsey assumed subsequent to entering into its Contracts with T.Co. In short, T.Co did not cause Dempsey to "have to" purchase this steel and is thus not liable to Dempsey for these costs.

### 4. __Dempsey Cannot Prove Its Fourth Counterclaim: Damage To Machinery.__

In its Fourth Counterclaim, Dempsey demands $10,000 for damages to its machinery that it allegedly incurred while processing the pipe it accepted under the Sales Contracts. Dempsey Amended Answer and Counterclaims at ¶ 83. Thus far, Dempsey has produced no evidence. Again, in discovery T.Co sought the evidence requesting:

> 18.   All records of machine threading breakdowns between January 1, 2004 and June 30, 2006.
>
> 19.   All repair records of threading machines between January 1, 2004 and June 30, 2006.

20. All vendor invoices for threading machine repairs between January 1, 2004 and June 30, 2006.

T.Co Ex. 51.

Dempsey produced nothing in response to these requests, therefore Dempsey cannot prove that T.Co is liable for the damage to its machinery because Dempsey did not keep any records sufficient to establish (a) the extent of this alleged damage, or (b) the extent to which this damage was due to the processing of pipe it purchased from T.Co. Yet again, Dempsey cannot prove that T.Co had anything to do with the damages it alleges.

**5.    Dempsey Cannot Prove Its Fifth Counterclaim For Storage Charge. Its Own Failure To Pay On Time Cause These Charges To Be Incurred.**

In its Fifth Counterclaim, Dempsey demands "incidental damages" in the amount of $56,654.32 for certain storage costs Dempsey said it paid to the marine terminal in Philadelphia in order to procure the release of pipe remaining from the fourth shipment. *Id.* at ¶ 91.

Under its contracts with T.Co, Dempsey was entitled to 10 days storage on the pier. But the extra storage charges were incurred because Dempsey did not make payments to T.Co on time. T.Co rightly refused to release further pipe until Dempsey made the payments for already delivered goods. Thypin Statement at ¶ 45.

T.Co's releases, which were all faxed to Dempsey, clearly provide:

> All Materials Must Be Picked Up By [Date]. Thereafter, Dempsey Pipe must arrange for Storage.

*See, e.g.,* T.Co Ex. 9 (TCO 0012). Dempsey has no one to blame for these costs but itself and they cannot be recovered from T.Co.

**III.    CONCLUSION**

T.Co requests an award that:

-45-

1.    T.Co Is Entitled To Payment Of Its Outstanding Bills In The Amount Of $338,079.32 Together With Interest At 9 Percent From January 1, 2006 To The Date Of Payment With Costs And Fees.

2.    Denial Of Dempsey's Counterclaims With Costs And Fees.

3.    Costs And Fees To Be Determined At A Hearing To Be Scheduled If The Parties Cannot Agree On A Figure Within 30 Days Of This Decision And Award Or Such Other Time As The Arbitrator Deems Appropriate.

Respectfully,

Montgomery, McCracken, Walker & Rhoads, LLP

Dated: December 11, 2006    By:    _____
    Alfred J. Kuffler, Esquire
    Lathrop B. Nelson, III, Esquire
    Attorneys for T.Co Metals, LLC
    123 South Broad Street
    Avenue of the Arts
    Philadelphia, PA 19109
    (215) 772-1500

-46-

# EXHIBIT D

Page 715

1
2  BEFORE THE INTERNATIONAL CENTRE
   FOR DISPUTE RESOLUTION OF THE
3  AMERICAN ARBITRATION ASSOCIATION
   ----------------------------------X
4  In the Matter of the
   Arbitration between
5
   T. CO METALS LLC,
6
                Claimant,
7
            -and-              No. 50143T0027806
8
   DEMPSEY PIPE & SUPPLY INC.,
9
                Respondent.
10 ----------------------------------X
11
12        1155 Avenue of the Americas
13            New York, New York
14          Monday, March 19, 2007
15              12:00 p.m.
16
17 B E F O R E:
18      PAUL D. FRIEDLAND, Arbitrator
19
20
21
22
23
24 Reported by:
   JOAN WARNOCK
25 JOB NO. 192660

**Arbitration**

Page 920

Closing - Goldstein

1 that we didn't pay, bottom line,
2 1,358,235 plus interest.
3     If you did it on the basis of the
4 scrap metal market, and I won't go
5 through the whole thing, but if you
6 substituted 200 here for 350, the number
7 would come out something like a
8 million 666, and so I disposed of that
9 for perhaps a different reason than
10 you've disposed of it, but I disposed of
11 that on the grounds that it produces an
12 economic result which is greater than
13 full performance would have produced,
14 which is why I did this exercise to
15 begin with. Frankly, even if you did
16 two formulas and did one with 350, one
17 with 200, and averaged them, you would
18 still come out with a number that's
19 higher than full performance. And so
20 that is the number.
21     Now, time is short and I want to
22 give the floor to Mr. Kuffler, and so
23 I'm going to be very brief on processing
24 costs. You were right, and we made a

Page 921

Closing - Goldstein

1 mistake in the affidavit, because we
2 said in the witness statement that it
3 took four times as long, and that the
4 result was instead of doing twelve per
5 hour, we were reduced to three per hour.
6 But that's three per hour per machine.
7 And there are three machines in Bolivar
8 and one machine in New Hampshire. So
9 that's really three per hour per
10 machine, which is four. Three times
11 four is twelve per hour. In a ten-hour
12 day, that's 120. In a five-hour week,
13 that's 600 pieces. In 22 weeks, it's
14 13,000 pieces, which is four, five
15 months, not for 2007. And I came to
16 your figure in a slightly different way,
17 which was that I corrected what
18 Mr. Dempsey had said in his witness
19 statement that this added eight or nine
20 minutes per piece. When he said it took
21 four times as long, that meant it went
22 from five minutes a piece to 20 minutes
23 a piece, and the increment is 15. And
24 using 15 minutes a piece converting to

Page 922

Closing - Goldstein

1 hours and multiplying by 125 an hour, I
2 got exactly your number, 421,375. Thank
3 you. That's the answer on that.
4     Storage costs, I refer to our
5 witness statements. There wasn't much
6 testimony about it. We paid the storage
7 costs because we had to get the pipe.
8 We incurred the storage costs because of
9 two things. The pipe came in on the
10 boats, and T.Co wouldn't release it.
11 There were significant release delays.
12     ARBITRATOR: Isn't that
13 consequential damage anyway?
14     MR. GOLDSTEIN: No. That's
15 incidental damage, incidental damage,
16 which is recoverable. And so we paid
17 the bills to get the pipe. Freight
18 charges for transporting material back
19 and forth to Bolivar are in the same
20 category, incidental damages. And the
21 numbers are there, and the invoices that
22 we've provided to you confirm them. On
23 the storage charges issue, I think it's
24 Exhibit 47 which has the dates of

Page 923

Closing - Goldstein

1 pickups per the stevedore records, and
2 if you line those up with the release
3 dates, you'll see that once T.Co issued
4 a release, we got there with a truck.
5 It was the release delays that resulted
6 in the accrual of storage charges.
7 Mr. Thypin wouldn't bear them. We had
8 no choice but to pay them. The
9 testimony is we paid them under protest,
10 and that's the way it came out. I cede
11 the floor Mr. Kuffler.
12     MR. KUFFLER: Thank you,
13 Mr. Goldstein. Mr. Friedland, now there
14 may not be a lot of order to the way I
15 do this, my apologies, but let me while
16 this is fresh in mind talk about these
17 numbers that were put up here. First of
18 all, I'm not sure I followed everything
19 about the processing costs, but let me
20 point out the testimony -- this is a
21 hell of a time to say that a witness
22 statement was incorrect. Witness
23 statements, there was examination,
24 cross-examination, that everything has

53 (Pages 920 to 923)

**Arbitration**

Page 924

Closing - Goldstein

1    been done in reliance on that. If we
2    want to start talking about credibility,
3    I suppose this isn't a bad place to pick
4    up that theme.
5         But let me point out something
6    else. The testimony is also
7    uncontradicted that 80 percent of the
8    quarter wall material went to Hooksett.
9    There is one machine up there, that
10   fancy computer-driven gismo that was the
11   subject of a lot of testimony. So I
12   think we stand on it takes four times as
13   long. The figures that I've put forward
14   as to what that actually means seem to
15   be the right ones given the evidence
16   from Dempsey themselves.
17        Now, let's talk about all this fair
18   market value stuff under 2.7.14.2.
19   First of all, it seems to me that there
20   are two issues that you need to decide
21   here before we ever even get to thinking
22   about this. First is whether you need
23   to deal with fair market value given the
24   exclusion of consequential damages in

Page 925

Closing - Goldstein

1    the contract.
2         And let me digress here for a
3    moment and say that I think this has
4    been a fascinating discussion this
5    afternoon. It comes right back to where
6    I started. Dempsey is running away from
7    this contract. I would submit that
8    since Dempsey has never bothered to read
9    the contract, I'm not sure we have to
10   have a lot of sympathy for them in terms
11   of the contract terms. That also leads
12   me to point out that when I
13   cross-examined Pat Dempsey, initially he
14   thought when he was dealing with
15   Mr. Thypin his remedies were just those
16   set out in the contract, notwithstanding
17   that he hadn't read them. A credit
18   against the purchase price or
19   replacement. That's his testimony.
20   That was what was in his first witness
21   statement when we got talking about the
22   oral compensation agreement. That was
23   what he thought his remedy was. Then it
24   wasn't until the second witness

Page 926

Closing - Goldstein

1    statement that we start finding out
2    about market losses. That's all very
3    clear, it's in his statements, and I
4    cross-examined him on those points, and
5    I really pressed him a number of times
6    on a number of issues. Now that first
7    witness statement, that was correct when
8    you signed it, wasn't it? It was as
9    complete as it could be. And, you know,
10   he said, well, some of these things, you
11   know, we did it in a hurry. Well, the
12   lawyers put it together, and they did it
13   presumably on the basis of what
14   Mr. Dempsey told them. So I'll stand on
15   my cross-examination.
16        Anyway, coming back to -- I
17   apologize for the ever-lengthening
18   digression, but let's come back to these
19   fair market value issues. Even if you
20   decide that we can bypass the exclusions
21   in the contract, the next question you
22   have to decide is whether the stuff was
23   actually sold at market or not. And I
24   spent a lot of time this morning talking

Page 927

Closing - Goldstein

1    about that, and I will come back to --
2    well, while I'm there, let me talk about
3    the Morris part of this. The Morris
4    material is pretty interesting.
5         First of all, Mr. Goldstein said
6    that you sustained an objection to a
7    comment about market. That's true, but
8    Mr. Goldstein has cherry-picked on what
9    the evidence was, because if you go back
10   and look at Mr. Stern's other testimony,
11   it is quite clear that he is talking
12   about market. Page 638 he says,
13   "Dempsey's pricing out there, he's very
14   competitive, and I can't get a nickel a
15   foot more. They'll blow me out."
16   Page 677 he says, "It's a highly
17   competitive market." He says the same
18   on pages 657, 658. As far as Mr. Stern
19   is concerned, he's talking his prices
20   are market. Remember under
21   cross-examination he said the summaries
22   that he used, they're average, they're
23   monthly averages, they pick up the high,
24   the low. I believe he said any rejects

**Esquire Deposition Services**
**1-800-944-9454**