# EXHIBIT G

## BEFORE THE INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## OF THE AMERICAN ARBITRATION ASSOCIATION

---

In the Matter of Arbitration Between:

T. CO. METALS LLC,

Claimant,

-and-

DEMPSEY PIPE & SUPPLY INC.,

Respondent.

Case No. 50 154 T. 00278 06

---

### AMENDED FINAL AWARD

---

4 June 2007

**Paul D. Friedland**

Sole Arbitrator

Table of Contents

Page

I.    The Parties .......................................................................................... 1

II.   Procedural History ............................................................................. 1

III.  Arbitrator's Authority to Correct the Award ...................................... 6

IV.  The Underlying Dispute ...................................................................... 7

      A.    Facts ....................................................................................... 7

      B.    Claims .................................................................................... 9

V.   Discussion ........................................................................................ 10

      A.    Dempsey's Liability to Pay Outstanding T.Co Invoices ..................... 10

      B.    Dempsey's Entitlement to Damages on Counterclaims......................... 13

            1.    Was There Sufficient Notice of Dempsey's Claim?.................... 13

                  a.    The Algarve V52 Shipment ......................................... 14

                        i.    Did T.Co accept an alternative means of notification?......14

                        ii.    What was the content of the notice? ................................. 15

                  b.    The Toscana V53 Shipment........................................... 17

                        i.    Did T.Co accept an alternative means of notification?......17

                        ii.    Is T.Co estopped from requiring compliance with the formal notice requirements? .............................................. 17

                  c.    The Normandie V54 Shipment ....................................... 18

                        i.    Did T.Co accept an alternative means of notification?......18

                        ii.    What was the content of the notice? ................................. 20

                  d.    Did T.Co suffer any prejudice because of inadequate notice by Dempsey?.................................................................. 21

             2.    Are the Limited Remedies Clauses Enforceable?......................... 22

                  a.    Did the Limited Remedies Clauses fail as to their essential purpose?................................................................... 22

Table of Contents (Cont'd)

Page

b.   Did the Limited Remedies Clauses fail as to their essential
purpose only because Dempsey failed to offer T.Co an
adequate opportunity to cure?....................................................24

3.   Quantum of Defective Pipe..............................................................25

a.   The Algarve V52 Shipment ..........................................27

b.   The Toscana V53 Shipment..........................................27

c.   The Normandie V54 Shipment ....................................27

4.   Calculation of Damages....................................................................28

a.   Exclusion of consequential damages .............................28

b.   Dempsey's counterclaim for diminished value of accepted non-
conforming pipe..........................................................29

i.   Value of the pipe as warranted............................29

ii.   Value of the pipe as accepted (out of tolerance)................33

c.   Additional processing costs ..........................................37

d.   Storage costs ...............................................................37

e.   Freight charges............................................................38

5.   Interest..............................................................................................39

6.   Costs and Attorneys' Fees ...............................................................40

C.   Rulings ......................................................................................................41

ii

## I.    THE PARTIES

Claimant:

T.Co Metals, LLC
P.O. Box 309
Princeton, N.J. 08542
U.S.A.

Represented by:

Alfred J. Kuffler, Esq. and Lathrop B. Nelson III, Esq.
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Avenue of the Arts
Philadelphia, PA 19109
U.S.A.

Respondent:

Dempsey Pipe & Supply, Inc.
80 Liberty Street
Bolivar, N.Y. 14715
U.S.A.

Represented by:

Marc J. Goldstein, Esq.

and

Julia M Hilliker, Esq.
Hodgson Russ, LLP
230 Park Avenue, 17th Floor
New York, N.Y. 10169
U.S.A.

## II.    PROCEDURAL HISTORY

1.    On 19 June 2006, Claimant T.Co Metals, LLC (*T.Co*) filed its Demand for Arbitration with the International Centre for Dispute Resolution (*ICDR*) against Respondent Dempsey Pipe & Supply, Inc. (*Dempsey*), seeking damages in the amount of $338,039.72, together with interest and costs, including attorneys' fees.

1

2.      On 20 July 2006, Dempsey filed its Answer and Counterclaims, seeking $1,982,080.32 in damages, plus interest, costs and fees.

3.      In August 2006, Paul D. Friedland was appointed Sole Arbitrator.

4.      On 22 August 2006, T.Co filed its Answer to the Counterclaims of Dempsey.

5.      On 6 September 2006, a preliminary conference was held.

6.      On 7 September 2006, the Arbitrator issued Procedural Order No. 1 addressing the procedure for the pre-hearing submissions, and the hearing.

7.      On 12 September 2006, as agreed between the parties at the preliminary conference, the Arbitrator issued a Scheduling Order, which provided a schedule for submission of an amended counterclaim and response thereto, exchange of document requests, any application for an interim award, expert reports, prehearing submissions, and the hearing.

8.      On 15 September 2006, Dempsey filed an Amended Answer and Counterclaims, and on 22 September 2006, T.Co filed its Answer to the Amended Answer and Counterclaims.

9.      On 13 October 2006, T.Co filed an Application for Interim Award.[1]  On 27 October 2006, Dempsey filed its Opposition to T.Co's Application.  On 13 November 2006, T.Co filed its Reply.  On 17 November 2006, a hearing on T.Co's Application was held. Counsel for both sides presented arguments, and responded to questions by the Arbitrator.

10.     On 21 November 2006, pursuant to an application by Dempsey and with the consent of T.Co, the Arbitrator issued two third-party subpoenas, to Commercial Pipe & Supply Co., Buffalo, N.Y., and to Ferguson Enterprises, Inc., Albany, N.Y.

11.     On 22 November 2006, the Arbitrator issued a Decision on Claimant's Application for Partial Award, in which the Arbitrator made the following rulings:

- T.Co's Standard Terms and Conditions of Sale (**_T.Co's Standard Terms_**) were incorporated into the Sales Contracts as a matter of law.

- Dempsey is a "merchant" within the meaning of N.Y. U.C.C. § 2-104(1).

---

[1] Although labeled an application for an "interim" award, the application in fact was for a "partial" award.

2

- The pleadings and argument on T.Co's Application for Interim Award raised material issues of fact with respect to:

  o whether T.Co acted in bad faith or fraudulently induced Dempsey to enter into any oral compensation agreement;

  o whether the alleged oral compensation agreement is unenforceable pursuant to the no-oral-modification clause in T.Co's Standard Terms, the N.Y. Statute of Frauds or the N.Y. General Obligations Law;

  o whether the alleged oral compensation agreement is unenforceable due to being indefinite as to the essential terms of price and quantity, or due to being merely an agreement to agree in the future; and

  o whether the alleged oral compensation agreement, and any breach/repudiation thereof, affected Dempsey's obligation to pay T.Co as invoiced (without setoff).

- T.Co's Application for Interim Award was denied, and submissions as to costs and attorney's fees were reserved.

12. On 11 December 2006, pursuant to an application by Dempsey, which was not opposed by T.Co, the Arbitrator issued a third-party subpoena to Prime Metal Corp., Walden, N.Y.

13. Also on 11 December 2006, the parties filed their Pre-Hearing Memoranda of Law and witness statements.

14. On 12 December 2006, the Arbitrator issued Procedural Order No. 2, ruling that paragraphs 5 to the end of the witness statement of Edgar Priebe (*Priebe Statement*), submitted by Dempsey, constituted expert testimony submitted after the due date for submission of expert reports, and would not be considered by the Arbitrator. Mr. Priebe's live testimony also would not be heard on the subjects covered in paragraphs 5 to the end of the Priebe Statement.

15. On 15-20 December 2006, a hearing on the merits was held in New York. Counsel for both sides presented arguments. At the hearing, the parties agreed to adjourn the

3

remainder of the hearing on the merits until the new year. Also at the hearing, the parties agreed that Dempsey could submit in full the Priebe Statement, provided that T.Co had the opportunity to respond with an expert report.

16.    On 22 December 2006, and in lieu of submitting a responsive expert report, T.Co requested the Arbitrator to issue a third-party subpoena to Morris Industries Inc. (*Morris*).

17.    On 3 January 2007, the Arbitrator issued Procedural Order No. 3, granting T.Co's request that a third-party subpoena be issued to Morris, and granting in part and denying in part Dempsey's request that, *inter alia*, the scope of the third-party subpoena to Morris be widened.

18.    On 4 January 2007, the Arbitrator issued Procedural Order No. 4, declining Dempsey's request to amend Procedural Order No. 3, and also issued a subpoena *duces tecum* to Morris.

19.    On 10 January 2007, T.Co transmitted to the Arbitrator the affidavit of Mike Stern of Morris responding to the subpoena *duces tecum* issued to Morris on 3 January 2007, attaching two documents in response to the subpoena *duces tecum*, and otherwise objecting to the further production of documents in response to the subpoena *duces tecum*.

20.    Also on 10 January 2007, Dempsey submitted a reply expert witness statement of Roger Schagrin.

21.    On 22 January 2007, the Arbitrator issued Procedural Order No. 5, ruling that the affidavit of Mr. Stern would be considered on the condition that Mr. Stern appear at the hearing for the purpose of cross examination.

22.    On 25 January 2007, Dempsey notified the Arbitrator that it had filed a motion to compel with the U.S. District Court for the Southern District of New York, to compel Morris to comply with the subpoena *duces tecum* issued by the Arbitrator to Morris on 3 January 2007. The Arbitrator understands that Morris objected to the motions to compel, and that hearings were held before Judge Owen on 6 and 8 February 2007.

23. On 9 February 2007, the Arbitrator issued Procedural Order No. 6, the subject of which was a document produced by Morris to Dempsey, in a redacted form, during the hearing on 6 and 8 February 2007 before Judge Owen. In Procedural Order No. 6, the Arbitrator declined the invitation from counsel for Morris to review *in camera* the un-redacted Morris document, noted the representations of counsel for Morris and T.Co in respect of the content of that document, and denied Dempsey's application for a further subpoena directed to Morris.

24. On 12 February 2007, the parties submitted additional exhibits upon which they intended to rely.

25. On 13-15 February 2007, the hearing on the merits continued in New York. Counsel for both sides presented arguments. At the hearing, the parties agreed on certain conversion rates from prices/foot to price/short ton of pipe of different thicknesses.[2] Also at the hearing, the parties agreed that there would be no post-hearing briefs, and that final argument and closing submissions would take place on 15 February 2007.

26. On 9 February 2007, the parties submitted their pleadings on the allocation of fees and costs in this matter, and supplemental legal authorities.

27. On 14 February, the parties agreed to an adjournment of the oral argument until 19 February 2007. On 19 February 2007, counsel for both sides presented their closing arguments, and responded to questions previously circulated by the Arbitrator.

28. On 20 April 2007, the Arbitrator issued the Final Award (the *Award*).

29. On 30 April 2007, Dempsey submitted an application to amend the Award (the *Dempsey Application*).

30. On 11 May 2007, T.Co responded to the Dempsey Application by letter (*T.Co Response*), and attached a Petition to Correct the Award (*T.Co Petition*, and, together with the T.Co Response, the *T.Co Response and Petition*).

---

[2] The parties agreed that: 0.188 inch wall pipe weighs 12.97 pounds per foot; 0.250 inch wall pipe weighs 17.02 pounds per foot; 0.280 inch wall pipe weighs 18.97 pounds per foot. These rates will be used in this Award, and the unit used for all prices of pipe will be US$/short ton.

31. By agreement between the parties, acknowledged by the ICDR,[3] Dempsey was given until 23 May 2007 to respond to the T.Co Response and Petition.

32. On 22 May 2007, Dempsey responded to the T.Co Response and Petition by letter (*Dempsey Reply*).

33. On 23 May 2007, T.Co responded to the Dempsey Reply by letter (*T.Co Rejoinder*).

34. On 30 May 2007, the Arbitrator issued an Order (the *30 May 2007 Order*), correcting certain clerical errors in the Award.

## III.    ARBITRATOR'S AUTHORITY TO CORRECT THE AWARD

35. As both parties acknowledge, the Arbitrator's authority to interpret or correct the Award is limited by Article 30 of the ICDR International Rules, which provides:

> 1. Within 30 days after the receipt of an award, any party, with notice to the other parties, may request the tribunal to interpret the award or correct any clerical, typographical or computation errors or make an additional award as to claims presented but omitted from the award.

> 2. If the tribunal considers such a request justified, after considering the contentions of the parties, it shall comply with such a request within 30 days after the request.

36. The Dempsey Application and the T.Co Response and Petition were both made within 30 days after the Parties' receipt of the Award, and are therefore timely. Pursuant to the Parties' agreement to permit Dempsey additional time to answer the T.Co Response and Petition, the Arbitrator considers that the Dempsey Reply was also timely made. Although there was no agreement between the Parties to permit T.Co to respond to the Dempsey Reply, the Arbitrator considers that, under the circumstances, the T.Co Rejoinder should also be deemed timely.

37. Pursuant to Article 30.2 of the ICDR International Rules, any decision by Arbitrator in response to a "request ... to ... correct" is due "within 30 days after the request". The

---

[3] Email from Michael F. Namias, ICDR Supervisor, to the Arbitrator, dated 14 May 2007.

initial post-Award request was submitted by Dempsey on 30 April 2007.  The 30 May 2007 Order was therefore timely.[4]

38.    For convenience, the Arbitrator issues this Amended Final Award, which incorporates the clerical corrections made by the Arbitrator in the 30 May 2007 Order.

## IV.    THE UNDERLYING DISPUTE

### A.    Facts

39.    On 25 February 2005, T.Co and Dempsey entered into Sales Contract 2094 for the sale by T.Co to Dempsey of 1,440 metric tons of "prime newly manufactured electric resistant welded pipe".

40.    On 25 April 2005, T.Co and Dempsey entered into Sales Contract 2095 for the sale by T.Co to Dempsey of 1,000 metric tons of "prime newly manufactured electric resistant welded pipe".

41.    The total tonnage contracted for both Sales Contract 2094 and Sales Contract 2095 (together, the *Sales Contracts*) was 2,330 metric tons (2,690 short tons).[5]  The Sales Contracts specified that the pipe was to be of a quality "ASTM A53-02 Grade B, dual certified to ASME SA53-01 Grade B. Weld seam annealed", with a maximum deviation from straightness of 0.25 inches in 20 feet.

42.    The pipe covered by the Sales Contracts was shipped from Chile in four shipments.[6]  For each shipment, the manufacturer, Cintac S.A. (*Cintac*), shipped the pipe to a port in Philadelphia, Pennsylvania.

43.    The first shipment -- 442 shot tons of 0.250 inch wall pipe purchased under Sales Contract 2094 -- was shipped aboard the vessel Normandie V51 in May 2005

---

[4] The Arbitrator also believes that the date of the final post-Award submission made by the Parties, the T.Co Rejoinder dated 23 May 2007, can be considered under the circumstances to be the date of the "request ... to ... correct" within the meaning of Article 30 of the ICDR International Rules. The Arbitrator further considers that the Parties have, by submitting their requests for correction of the Award over a series of written communications, accepted that the date of the request under Article 30 of the ICDR International Rules can be deemed to be the last date of their submissions.

[5] In this Award, the unit used for all quantities of pipe will be short tons.  Where conversions from metric tons have had to be made, the Arbitrator used the ratio: 1 metric ton = 1.1023 short tons (1 metric ton = 2,204.6 pounds; 1 short ton = 2000 pounds).

[6] On 3 April 2007, the parties communicated to the Arbitrator their stipulation as to the tonnage of pipe transported on each shipment.

(*Normandie V51 Shipment*).  This pipe was received by Dempsey in mid May 2005 and was processed by Dempsey without problem.

44.  The second shipment -- 683 short tons of 0.250 inch wall pipe, 160 short tons of 0.188 inch wall pipe and 110 short tons of 0.280 inch wall pipe purchased under Sales Contract 2094 -- was shipped aboard the vessel Algarve V52 in May 2005 (*Algarve V52 Shipment*).  The first release from the Algarve V52 Shipment was received by Dempsey on or about 27 June 2005.

45.  Upon inspection of the pipe in the first release of the Algarve V52 Shipment, Dempsey noted that the pipe was bowed across its length and that it was bent at the ends.  The parties disagree about the quantity of pipe which was affected by the bowed and/or bent condition.  Dempsey ultimately rejected 139 of the 160 short tons of 0.188 inch wall pipe from the Algarve V52 Shipment.

46.  During the first week of July 2005, Patrick Dempsey (*Pat Dempsey*) of Dempsey contacted Richard Thypin (*Thypin*) of T.Co by telephone and raised concerns about the straightness of the pipe in the first release of the Algarve V52 Shipment.  The parties disagree about what was said during the telephone call.

47.  In July 2005, Dempsey began processing the pipe from the Algarve V52 Shipment.

48.  On 21 July 2005, at T.Co's request, an independent surveyor, Reinhard F. Kuffel (*Kuffel*), inspected a sample of pipe from the Algarve V52 Shipment and found the sample to be out of tolerance for straightness.  Kuffel's Report of Inspection notes that, although processed with difficulty, all the pipe (except for the equivalent of two bundles) was used and shipped to Dempsey's customer.

49.  On 24 August 2005, again at T.Co's request, surveyor Kuffel inspected an additional sample of pipe from the Algarve V52 Shipment.  This pipe was also found to be out of tolerance for straightness.  One bundle tested was severely out of tolerance.

50.  The third shipment -- 203 short tons of 0.250 inch wall pipe purchased under Sales Contract 2094 and 243 short tons of 0.250 inch wall pipe purchased under Sales Contract 2095 -- was shipped aboard the vessel Toscana V53 in July 2005 (*Toscana V53 Shipment*).  Dempsey processed and sold the pipe from the Toscana V53 Shipment.

51.    On 19 September 2005, Thypin emailed Kuffel's Report of Inspection to Dempsey. The Report concluded that the pipe tested was out of tolerance for straightness, "with bending at the pipe ends creating additional severe problems in processing". The Report noted that Dempsey rejected delivery of any additional 0.188 inch pipe because processing the pipe "takes a destructive toll on their machinery". The Report also recorded that Dempsey processed 440 pieces and rejected 148 pieces of 6 inch by 0.250 inch pipe "as being unusable and too dangerous to run on their machine, a 34% rejection ratio". The Report concluded that the bow in the pipe was due "to deficiencies related to manufacturing. The fact that the problem was found in both sizes suggests a wider spread problem instead of a problem limited to a small batch of production due to temporary malfunction."

52.    Thypin and Pat Dempsey met in September 2005. The parties disagree about the content of their exchange.

53.    The fourth shipment – 849 short tons of 0.250 inch wall pipe purchased under Sales Contract 2095 -- was shipped aboard the vessel Normandie V54 in July 2005 (***Normandie V54 Shipment***). Release of the Normandie V54 Shipment began in mid-September 2005 and continued in installments through December 2005. Dempsey processed and sold the pipe from the Normandie V54 Shipment.

54.    On 23 September 2005, Dempsey emailed T.Co regarding alleged discrepancies between the amounts of pipe invoiced and the amounts received.

55.    From May 2005 through December 2005, T.Co issued invoices to Dempsey totaling $1,993,145.53. To date, Dempsey has paid $1,655,105.81 pursuant to the Sales Contracts. Dempsey stopped payment of T.Co's invoices after 21 February 2006, and has not paid the five invoices issued by T.Co to Dempsey from October 2005 through December 2005, which total $338,039.72.

**B.    Claims**

56.    T.Co claims: damages in the amount of $338,039.72 for outstanding invoices issued by T.Co to Dempsey; interest; costs, including attorneys' fees; and such other relief as appears just in the circumstances.

57.  Dempsey counterclaims:[7]  damages in the amount of $1,895,052[8] for the diminished value of the 1999 short tons of combined 0.188 inch wall pipe and 0.250 inch wall pipe Dempsey accepted;[9] incidental damages in the amount of $421,375[10] for additional processing costs associated with the defective pipe; damages in the amount of $56,654.32 for storage costs paid by Dempsey to DRS River Stevedores, Inc. (**DRS**), for which Dempsey maintains T.Co is liable; damages in the amount of $31,803 for freight charges incurred to transport the most severely bent pipe from its Hooksett, NH operation to Bolivar, NY, and $1,686 for freight charges incurred to transport pipe to and from Walden, N.Y. for inspection by T.Co and the Cintac mill; interest; attorneys' fees and costs; and such other and further relief as the arbitrator deems just and proper.

## V.    DISCUSSION

58.  This Award will not state all the arguments and evidence presented by each party on all issues. For concision, only the essential arguments and evidence will be set out.

### A.    Dempsey's Liability to Pay Outstanding T.Co Invoices

59.  It is uncontested that Dempsey has not paid T.Co invoices totaling $338,039.72. Dempsey contends, however, that it was, and is, entitled to set off the $338,039.72 outstanding on T.Co's invoices against the damages due to Dempsey. At the core of this submission is Dempsey's argument that T.Co and Dempsey made an enforceable oral

---

[7] In its Amended Answer and Counterclaims, ¶¶ 75-83, Dempsey claimed $119,482 for the cost of replacement pipe purchased to fulfill customer orders, and at least $10,000 for the cost of repair of Dempsey's machines damaged while processing the defective pipe. These counterclaims appear to have been withdrawn.

[8] In its Amended Answer and Counterclaims, ¶¶ 63, 91(b), Dempsey claimed $1,212,200 for the diminished value of 2090 tons of accepted pipe. In its Pre-Hearing Memo of Law, p. 26, Dempsey claimed $1,643,2800 for the diminished value of 2090 tons of accepted pipe, calculated at $948/short ton. In the parties' stipulation dated 3 April 2007, the parties stipulated that Dempsey has asserted no claim in respect of (i) the 442 short tons of 0.250 inch wall pipe from the Normandie V51 Shipment, which conformed to specifications, (ii) the 110 short tons of 0.280 inch wall pipe from the Algarve V52 Shipment, or (iii) the 139 short tons of 0.188 inch wall pipe from the Algarve V52 Shipment, which Dempsey rejected. Dempsey's claim for diminished value therefore relates to 1999 tons of accepted pipe at $948/short ton.

[9] *See* the parties' stipulation dated 3 April 2007.

[10] In its Amended Answer and Counterclaims, ¶¶ 70-74, Dempsey claimed $538,693.75 additional processing costs and $45,050 for additional manhours for shipping and other trucking costs. In its Pre-Hearing Memo of Law, p. 28, Dempsey claimed $261,250 for additional processing costs and overtime charges of $8,569.64. However, at the oral hearing held on 19 March 2007, Dempsey claimed that its actual processing costs were $421,375. Then, in the same hearing, Dempsey also advanced, and then withdrew, an argument that it is entitled to damages for the "foregone opportunity of getting good pipe and making a margin of $624 per ton." *See* Transcript, 19 March 2007, pp. 915-918. Dempsey's counterclaim for additional manhours appears to have been withdrawn.

agreement, the terms of which were that Dempsey would refrain from exercising its right to reject non-conforming pipe sold to it by T.Co under the Sales Contracts in exchange for T.Co's promise fairly to compensate Dempsey for losses and damages which would be sustained by Dempsey in connection with completing the purchase, processing and re-selling the non-conforming pipe (the *Oral Compensation Agreement*).[11]  Dempsey acknowledges that price and quantity terms were not agreed upon, but maintains that the Oral Compensation Agreement constituted a "binding preliminary agreement" to negotiate final terms of compensation agreement in good faith.[12]  Dempsey states that, had the Oral Compensation Agreement not been made, Dempsey would have rejected all of the non-conforming pipe.

60.     Dempsey argues that T.Co breached its obligation to negotiate in good faith in 2006 by demanding full payment of invoices, making an offer of $238,000 and commencing this arbitration.[13]

61.     Dempsey claims that T.Co's breach of good faith duty to negotiate means that T.Co may not rely on the following provisions of the parties' Sales Contracts:[14]  Clause 3.7 of T.Co's Standard Terms[15] (*No Set-Off Clause*);[16] Clauses 7.4 and 7.5 of T.Co's Standard Terms[17] (*Limited Remedies Clauses*); and the "Claim" clause on page 2 of the parties' Sales Contracts[18] (*Exclusion of Consequential Damages Clause*).

---

[11] Dempsey contends that this agreement arose out of at least two telephone exchanges between Pat Dempsey and Richard Thypin between July 2005 and October 2005, and an in-person meeting in Walden, N.Y. in the fall of 2005. *See* Dempsey Pre-Hearing Memo of Law p. 12.

[12] Dempsey Pre-Hearing Memo of Law p. 11.

[13] Dempsey Pre-Hearing Memo of Law p. 14.

[14] Dempsey Pre-Hearing Memo of Law p. 14.

[15] In the Decision on Claimant's Application for Partial Award, the Arbitrator held that T.Co's Standard Terms and Conditions of Sale were incorporated into the Sales Contracts as a matter of law.  The Arbitrator further held that Dempsey is a "merchant" within the meaning of N.Y. U.C.C. § 2-104(1), and therefore subject to the N.Y. U.C.C..

[16] Clause 3.7 of T.Co's Standard Terms provides:

> The Buyer shall not be entitled to withhold any payment of any amount payable to the Seller under the Contract because of any previously disputed claim of the Buyer in respect of faulty Goods or any other alleged breach of the Contract or any other Contract between the Buyer and the Seller, nor shall the Buyer be entitled to set-off against any other amount payable to the Seller under the Contract any moneys which are not then presently payable by the Seller or for which the Seller disputes liability.

[17] Clauses 7.4 and 7.5 of T.Co's Standard Terms provide:

> 7.4 Where any valid claim in respect of any of the goods which is based on any defect in the quality or condition of the Goods or their failure to meet specification is notified to the Seller in

11

62.  T.Co denies that there was any oral agreement, and denies that it made any promise of compensation to Dempsey in exchange for an agreement by Dempsey to accept the non-conforming pipe.[19]

63.  Whether Dempsey was entitled to off set the $338,039.72 outstanding on T.Co's invoices against the damages which Dempsey alleges are due on Dempsey's counterclaims therefore turns on whether there was an Oral Compensation Agreement between the parties.

64.  T.Co argues that any Oral Compensation Agreement was insufficiently definite to be enforceable under New York law, and in any event failed to satisfy the applicable "in writing" requirements.  The Arbitrator addresses the first argument only, because it is dispositive of this issue.

65.  Dempsey argues that the indefiniteness of the compensation promise is not an obstacle to enforcement because both parties clearly intended to be bound.[20]  Dempsey also argues that, in any case, the indefiniteness is explicable on the basis of market and business considerations:  Dempsey could not quantify in advance its incremental processing costs; nor could either party forecast the ultimate volume of non-conforming goods, or the price which Dempsey would get for them in the market.[21]

66.  Under New York law, a contract for the sale of goods must be definite with respect to the essential terms of price, quantity, time and manner of delivery.[22]  Yet, the fact that one or

---

accordance with these Conditions, the Seller shall be entitled to replace the Goods (or the part in question) or, at the Seller's sole discretion, credit the Buyer with the Contract price of the Goods (or a proportionate part of the price), but the Seller shall have no further liability to the Buyer.

7.5  The undertakings in Condition 7.4 herein are given in lieu of any other legal remedy and the liability of the Seller shall be for all purposes limited to the giving of any appropriate credit or repayment or replacement in accordance with that Condition. Under no circumstances shall the Seller be liable (save in respect of non-excludable statutory liability) for any other loss damage or expense whatsoever occasioned by any breach.

[18] The "Claim" clause on page 2 of the parties' Sales Contracts provides in relevant part:  Seller is not responsible for consequential loss or damage.

[19] T.Co Pre-Hearing Memo of Law, p. 6.

[20] Dempsey Pre-Hearing Memo of Law p. 3.

[21] Dempsey Pre-Hearing Memo of Law p. 13.

[22] Fakhoury Enters v. J.T. Distribs, 1997 U.S. Dist. LEXIS 7667 at *11 (S.D.N.Y. 1997); Judal Industries, Inc. v. Welsbach Elec. Corp., 138 A.D.2d 573, 574 (N.Y. App. Div. 1988); Kleinschmidt Division of SCM Corp. v. Futuronics Corp., 41 N.Y.2d 972, 973 (1977).

more terms are left open does not render an agreement unenforceable if the parties intended to make a contract, and there is a reasonably certain basis for giving an appropriate remedy.[23]

67.  While there were conversations between T.Co and Dempsey with reference to the non-confirming pipe, and T.Co likely said to Dempsey words to the effect that Dempsey should continue to process the pipe that it could use and set the rest aside, and that the parties would work out a deal at some later stage, the oral and written evidence of Pat Dempsey and Thypin demonstrate such divergent interpretations of their conversations that no mutual intention to be bound can be discerned. The Arbitrator finds that there was no agreement between T.Co and Dempsey on the essential terms of price and quantity; nor was there any clear intention on the part of T.Co to be bound to any such arrangement. This was an unenforceable agreement to discuss settlement terms at some time in the future.

68.  This finding is sufficient to reject Dempsey's contention that an Oral Compensation Agreement exists between T.Co and Dempsey. Therefore, Dempsey was not entitled to set-off the $338,039.72 outstanding on T.Co's invoices against the damages which Dempsey alleges are due to Dempsey. Dempsey is accordingly liable to pay $338,039.72 to T.Co on T.Co's unpaid invoices, plus interest accruing from 1 January 2006. In addition, the Exclusion of Consequential Damages Clause in the Sales Contracts remains in force.

**B.     Dempsey's Entitlement to Damages on Counterclaims**

**1.     Was There Sufficient Notice of Dempsey's Claim?**

69.  T.Co argues that Clause 6.1 of T.Co's Standard Terms governs the notice requirement, and provides that Buyer must give the Seller notice of non-conformity within 14 days of receipt of the goods and prior to their use or resale.[24] T.Co argues that Dempsey's failure to provide notice in compliance with this clause precludes Dempsey's counterclaims.

---

[23] *Id.*

[24] T.Co Pre-Hearing Memo of Law p. 24. *Note*, however, the "Claim" clause on page 2 of the parties' Sales Contracts, which provides in relevant part that "notice in writing of any claim by buyer shall be delivered to seller within 30 (thirty) days after release of the goods by seller and shall be accompanied by satisfactory documentary

70.     Dempsey argues that T.Co, by its conduct, waived the requirement of formal written notice of the defective pipe, or is estopped from requiring compliance with the formal notice requirements in the Sales Contracts.

71.     For waiver of a notice requirement, N.Y. courts require either (i) that the party's conduct is inconsistent with any intention other than the waiver of contract rights, or (ii) that the party has accepted alternative performance which provides roughly the same protection as strict performance would have provided.[25]

72.     It is Dempsey's position that, by arranging for expert inspection and reporting by Kuffel of Trans-Port Marine Surveyors, Inc., T.Co accepted an alternative means of notification of the defective condition that was as satisfactory as formal written notice would have been.[26]

### a.     The Algarve V52 Shipment

#### i.     Did T.Co accept an alternative means of notification?

73.     Dempsey picked up the first release of pipe from the Algarve V52 Shipment in late June 2005.[27]  Pat Dempsey stated: "[u]pon opening the bundles [of 0.188 inch wall pipe], it was visibly noticeable that the pipe was not straight and that it was bent at its ends."[28] Pat Dempsey further stated that "[o]n or about the first week in July, I called Richard Thypin in his office to report that all of the pipe that we had processed so far from the first release of the second shipment was clearly out of tolerance...."[29]  Dempsey's phone records show that Dempsey called T.Co on three occasions in the first week of July

---

evidence(s) thereof detailing the specific nature of each reject."  The Sales Contracts also provide that "[i]n the event of any conflict between the seller's standard terms and conditions of sale and any term or condition of this contract, the terms and conditions of this contract shall prevail."  Therefore the "Claim" clause on page 2 of the parties' Sales Contracts appears to govern the notice requirements for a claim by Dempsey.

[25] Dempsey Pre-Hearing Memo of Law pp. 15-16. *See, e.g.,* Kenvon & Kenvon v. Logany LLC, 823 N.Y.S.2d 72 (1st Dep't 2006); Madison Avenue Leasehold, LLC v. Madison Bentley Assocs., 30 A.D.3d 1, (1st Dep't 2006).

[26] Dempsey Pre-Hearing Memo of Law pp. 16-17; Transcript, 19 March 2007, p. 857.

[27] Affidavit of Patrick Dempsey, ¶ 17.

[28] Affidavit of Patrick Dempsey, ¶ 21.

[29] Affidavit of Patrick Dempsey, ¶ 26.

14

2005.[30]  Thypin confirmed that Pat Dempsey informed him that some of the .188 wall pipe did not conform to the Sales Contract.[31]

74.   Dempsey began to receive the pipe from the second release of Algarve V52 Shipment in late June 2005.[32]  Pat Dempsey's evidence is that "the same problems were being observed with the .250" wall as had been observed with the .188" wall pipe that had been rejected. The .250" wall pipe also was visually bent, bowed, and out of tolerance. After learning of this, I again contacted Thypin."[33]

75.   On 18 July 2005, Bevan Jones, also of T.Co, sent an email to Kuffel, which stated:

> Please conduct the survey at Bolivar NY as soon as possible.
>
> The customer [Dempsey] bought ... 0.188 inch pipe (shipped per MV Algarve).  So far he has taken only one load, which he claims is bent, to Bolivar NY.  Could you please travel up to Bolivar, and measure the bow.
>
> ...
>
> We will plan our next step in the survey process once we get your findings.

76.   The Arbitrator accepts that T.Co communicated to Dempsey its intention to send an inspector to look at the pipe which Dempsey had received.[34]

77.   From these exchanges, the Arbitrator finds that T.Co intended to rely upon the findings of Kuffel to determine the extent of Dempsey's claim.  The Arbitrator therefore accepts that there was an understanding between T.Co and Dempsey that Kuffel's reports of inspection would act as notice to T.Co of Dempsey's claim in respect of pipe from the Algarve V52 Shipment, such that T.Co waived and is estopped from invoking the formal written notice requirements under the Sales Contracts.

ii.    **What was the content of the notice?**

---

[30] Dempsey Exh. 14, p. 1.
[31] Transcript, 20 December 2006, p. 61.
[32] Additional Witness Statement of Patrick Dempsey, ¶ 25.
[33] Additional Witness Statement of Patrick Dempsey, ¶ 25.
[34] Affidavit of Patrick Dempsey, ¶ 33.

78.   Kuffel inspected pipe from the Algarve V52 Shipment at Dempsey's Bolivar facility on
21 July 2005, and first reported to T.Co on his inspection of pipe at Dempsey by email on
22 July 2005 (*July Inspection Report*).[35]  In the July Inspection Report, Kuffel stated:

> Except for the equivalent of approx. two bundles [out of seventeen], all
> pipe was used and shipped to Dempsey's customer.  Even though the pipe
> was processed with difficulty Dempsey's customer needed the material
> and D. decided to continue using and shipping it.
>
> The remainder of the pipe displayed a visible bow across the length.  The
> majority of the pipe shows and even concave/convex bow configuration
> ... up to 20-30% of the pipe showed a pronounced bow / bend at one end
> over a length of 3'-4' in addition to having the overall bow.... Field
> measurements using string showed a bow of approx. 3/8" depth/deviation.
> I would expect reading with potentially larger deviations in tests under lab
> conditions...."
>
> ...
>
> - The ¼" wall pipe appears to have a problem with bow as well, however,
> quantitatively more limited.  Reportedly, of 100 pieces processed at the
> NH facility some 20-30 pieces were found with a bow condition.

79.   Having conducted a further inspection of pipe from the Algarve V52 Shipment at
Dempsey's Hooksett facility on 24 August 2005, Kuffel issued a Report of Inspection
dated 31 August 2005 (*August Inspection Report*), in which he elaborated on the
condition of the pipe from the Algarve V52 Shipment:

> The company scheduled the pipe for threading and distribution but found
> that the pipe showed an out-of-tolerance bow with deviation of up to ½"
> from dead straight.[36]
>
> ...
>
> Moreover it was found that pipes had a bend....[37]
>
> ...
>
> Except for the equivalent of two bundles, all the pipe was used and
> shipped to Dempsey's customer.  Even though the pipe was processed
> with extreme difficulty...."[38]

---

[35] T.Co Exh. 21.

[36] August Inspection Report , p. 3 (T.Co Exh. 21).

[37] August Inspection Report , p. 3 (T.Co Exh. 21).

80.    In the analysis section of the August Inspection Report, Kuffel stated:

> Our findings confirm that the material from the subject shipment has a problem with out-of-tolerance straightness. The out-of-tolerance condition affects both the 0.188" wall product as well as the 0.250" wall product, with the bending at the pipe ends creating additional severe problems in processing
>
> ...
>
> In summary, we found that both sizes are equally affected with the out-of-tolerance condition.[39]

81.    The July and August Inspection Reports are inconclusive as to the exact quantity of pipe from the Algarve V52 Shipment which was affected by the out-of-tolerance condition. However, these Reports gave notice to T.Co that the 0.188" wall pipe and the 0.250" wall pipe, both from the Algarve V52 Shipment, were affected to an important degree by the out-of-tolerance condition.

### b.    The Toscana V53 Shipment

#### i.    Did T.Co accept an alternative means of notification?

82.    There was no inspection by Kuffel of any pipe from the Toscana V53 Shipment. In respect of this pipe, T.Co did not agree to any alternative means of notification of Dempsey's claim.

#### ii.    Is T.Co estopped from requiring compliance with the formal notice requirements?

83.    There is sufficient evidence that Dempsey telephoned T.Co at or around the time that Dempsey received and opened the bundles containing the pipe from the Toscana V53 Shipment.[40] It is likely that the subject of these telephone conversations was the out-of-tolerance condition of pipe from the Toscana V53 Shipment.

---

[38] August Inspection Report, p. 4 (T.Co Exh. 21).

[39] August Inspection Report, p. 7 (T.Co Exh. 21).

[40] Delaware River Stevedores, Inc.'s records show that Dempsey picked up the first 50 bundles of 0.250 inch wall pipe from the Toscana V53 Shipment on 24 August 2005. *See* T.Co Exh. 47, p. 8. Dempsey called T.Co three times on 24 August 2005, including one call of 3.6 minutes duration shortly after midday. Dempsey also called T.Co on 26 August 2005 and twice again on 29 August 2005 and then again for 4 minutes on 31 August 2005. See Dempsey Exh. 14, p. 1. *See also* Additional Witness Statement of Patrick Dempsey, ¶¶ 41-42.

84.   On 12 September 2005, Pat Dempsey and Thypin met at the port of Philadelphia and examined bundles of Cintac pipe.[41]  There is sufficient evidence that, of the bundles of Cintac pipe which were at the port of Philadelphia, 65 bundles were 0.250 inch wall pipe from the Toscana V53 Shipment.[42]  Pat Dempsey gave evidence that, at the meeting at the port of Philadelphia, he "was ... trying to show [Thypin] the bows in the pipe, but you couldn't get a good look at them because they're in bundles.  So I asked him if he wanted a stevedore to come over and cut them open."[43]  Pat Dempsey testified that Thypin replied that this would not be necessary.[44]  When asked on cross-examination whether, at the meeting at the port of Philadelphia on 12 September 2005, Pat Dempsey had in fact offered to have the bundles cut open so that he could see the condition of the pipe, Thypin stated that he did not recall.[45]  The Arbitrator accepts the testimony of Pat Dempsey with respect to the meeting at the port of Philadelphia on 12 September 2005.

85.   T.Co further had, through T.Co's phone conversations with Dempsey on or around 24 August 2005, actual knowledge that the first 50 bundles of 0.250 inch wall pipe from the Toscana V53 Shipment were affected by the out-of-tolerance condition.  During the meeting at the port of Philadelphia on 12 September 2005, Dempsey offered T.Co the opportunity to receive, first-hand, an understanding of the nature of the non-conforming pipe from the Toscana V53 Shipment, and T.Co declined Dempsey's offer.

86.   On this basis, with respect to the pipe from the Toscana V53 Shipment, although there was no agreed substitution of an inspection report for the formal notice requirements under the Sales Contracts, T.Co is estopped from requiring compliance with the formal notice requirements in the Sales Contracts.

   c.   **The Normandie V54 Shipment**

      i.   **Did T.Co accept an alternative means of notification?**

---

[41] Witness Statement of Richard Thypin, ¶ 101.

[42] See T.Co Exh. 47, pp. 8-11 (of the 374 bundles of 0.250 inch wall pipe in the Toscana V53 Shipment – Bill of Lading Nos. COPH 34 and COPH 35 – Dempsey had picked up 50 bundles before 12 September 2005).  This was acknowledged by Thypin on cross-examination. See Transcript, 13 February 2007, pp. 244-46.

[43] Transcript, 13 February 2007, p. 417.

[44] Transcript, 13 February 2007, p. 417.

[45] Transcript, 13 February 2007, p. 234.

18

87.   On 22 July 2005, Kuffel sent an email to Thypin stating:

> I am going to be at Tioga terminal next week when the Normandie comes in. Let me talk to stevedores and see what they have available. Ideally, I'd like to spin the pipes and using [sic] a dial indicator. If push comes to shove, we could even do that on forklift blades if nothing better is available.[46]

88.   On cross-examination, Thypin stated: "We did not instruct Kuffel to do what he describes here in this email...."[47] When asked why he did not instruct Kuffel to proceed with the suggested inspection, Mr Thypin explained that there were two reasons. First, at the time Kuffel made this offer, Thypin was uncertain about the scope and depth of the problem with the pipe, and second, Thypin was not sure that the conditions at the port would be suitable for an inspection.[48] The first reason is a motivation *for* conducting an inspection, rather than choosing *not* to conduct an inspection. Also, if Kuffel, an inspector by profession, thought that adequate facilities for inspection could be found at the port, then Thypin's second concern was unfounded. T.Co therefore declined a genuine opportunity to have its agent inspect the pipe from the Normandie V54 with a dial indicator.

89.   Then, on 12 October 2005, Kuffel conducted an inspection of pipe from the Normandie V54 Shipment[49] at the premises of Prime Metals, Walden, N.Y. Kuffel issued a report of this inspection on 20 October 2005 (***October Inspection Report***).[50] Dempsey was not present at the inspection.

90.   In respect of the pipe from the Normandie V54 Shipment, T.Co intended to rely upon the report of Kuffel to determine the extent of Dempsey's claim, such that T.Co waived the formal written notice requirements under the Sales Contracts. Even if T.Co did not

---

[46] Dempsey Exh. 38.

[47] Transcript, 20 December 2006, p. 76.

[48] Transcript, 20 December 2006, p. 77.

[49] Although the first page of the report of this inspection states that the pipe inspected came from the Algarve V52 Shipment, both parties acknowledge that all of the pipe inspected, but for three pieces, came from the Normandie V54 Shipment. This discrepancy was noted in T.Co Exh 37 and acknowledged by Thypin on cross-examination. *See* Transcript, 13 February 2007, pp. 272-273. Three of the pieces of pipe measured during the inspection, all marked with heat number 581282, were later found not to match pipe from either the Algarve V52 Shipment or the Normandie V54 Shipment. *See* T.Co Exh 37. *See also* Transcript, 13 February 2007, pp. 275-276.

[50] T.Co Ex 36.

19

intend that Kuffel's October Inspection Report would act as notice to T.Co of Dempsey's claim, T.Co had actual notice of Dempsey's claim via the October Inspection Report. This, and the fact that T.Co declined a genuine opportunity to have its agent inspect the pipe from the Normandie V54 Shipment with a dial indicator at the pier, estop T.Co from requiring compliance with the formal notice requirements in the Sales Contracts in respect of pipe from the Normandie V54 Shipment.

### ii.     What was the content of the notice?

91.    The October Inspection Report states:

> Except for the original bundle, the pipes were inspected in lots of 5 pieces. In each lot we found 3 pieces within tolerance and two pieces out-of-tolerance. In summary, 40% of the pipe was found to be out-of-tolerance in straightness.
>
> The original bundle contained 7 pieces of pipe of which 3 pieces were determined to be out-of-tolerance. Thus, 43% of the pipe was found to be out-of-tolerance.
>
> Furthermore, we found, as we had previously, that several pipes, from those in tolerance as well as from those out-of-tolerance, had a pronounced bend at one end.[51]

92.    The percentages quoted above are not accurate when compared to measurements of the individual pieces of pipe as recorded in the October Inspection Report. The October Inspection Report measures deviation from straightness in millimeters. The Sales Contracts specified that the pipe was to have a maximum deviation from straightness of 0.25 inches in 20 feet. The Arbitrator accepts that 0.25 inches converts to 6.35 millimeters.[52] Therefore, any deviation from straightness in excess of 6.35 millimeters is out of tolerance for the purposes of the Sales Contracts.

93.    Page 4 of the October Inspection Report sets out the results of the measurement of the pipe. Of the nineteen pieces which came from the Normandie V54 Shipment, twelve were found to have a deviation from straightness of 7 millimeters or more. Of the other seven pieces, two were reported to have a deviation from straightness of 6-7 millimeters.

---

[51] T.Co Ex 36, p. 5.
[52] See Dempsey Exh. 54.

Given that a string test was used during the inspection, and that a dial indicator would likely have shown a larger deviation,[53] it is likely that these two pieces had a deviation from straightness of more than 6.35 millimeters. On this basis, the October Inspection Report found that fourteen of the nineteen pieces of pipe from the Normandie V54 Shipment, which equals 74%, were out of tolerance for straightness. In addition, "several pipes, from those in tolerance as well as from those out-of-tolerance, had a pronounced bend at one end."[54] Therefore, depending on how many of the in tolerance pipes were bent at one end, 75-85% of the pipe from the Normandie V54 Shipment tested during this inspection was out of tolerance.

94.     The October Inspection Report therefore gave notice to T.Co that a significant proportion of the 0.250 inch wall pipe from the Normandie V54 Shipment was affected by the out-of-tolerance condition.

> ### d.     Did T.Co suffer any prejudice because of inadequate notice by Dempsey?

95.     The Arbitrator rejects T.Co's argument that insufficient notice by Dempsey caused T.Co to "settle" with the Cintac mill on the basis of a much smaller rate of non-conforming pipe.[55] First, T.Co had adequate notice of a high non-conformity rate. Second, on cross examination, Thypin acknowledged that T.Co has not signed any settlement with Cintac; nor has T.Co signed any release of its claims against Cintac.[56]

---

[53] *See* email from Kuffel to Thypin dated 22 July 2005 in which Kuffel states: "Field measurements with string showed a bow of approx. 3/8" depth / deviation. I would expect readings with potentially larger deviations in tests under lab conditions, such as spinning the pipe against a dial indicator." T.Co Exh. 21.

[54] T.Co Ex 36, p. 5.

[55] T.Co Pre-Arbitration Memo of Law, p. 26.

[56] Transcript, 20 December 2006, pp. 185-186.

2. **Are the Limited Remedies Clauses Enforceable?**

    a. **Did the Limited Remedies Clauses fail as to their essential purpose?**

96.    T.Co argues that, even if Dempsey can establish that there was adequate notice to T.Co of Dempsey's claim, the remedies available to Dempsey are limited to those in the Limited Remedies Clauses of T.Co's Standard Terms.[57]

97.    Clause 7.4 of T.Co's Standard Terms provides:

> Where any valid claim in respect of any of the goods which is based on any defect in the quality or condition of the Goods or their failure to meet specification is notified to the Seller in accordance with these Conditions, the Seller shall be entitled to replace the Goods (or the part in question) or, at the Seller's sole discretion, credit the Buyer with the Contract price of the Goods (or a proportionate part of the price), but the Seller shall have no further liability to the Buyer. [Emphasis added.]

98.    Clause 7.5 of T.Co's Standard Terms states:

> The undertakings in Condition 7.4 herein are given in lieu of any other legal remedy and the liability of the Seller shall be for all purposes limited to the giving of any appropriate credit or repayment or replacement in accordance with that Condition. Under no circumstances shall the Seller be liable (save in respect of non-excludable statutory liability) for any other loss damage or expense whatsoever occasioned by any breach. [Emphasis added.]

99.    T.Co argues that the Limited Remedies Clauses are enforceable pursuant to N.Y. U.C.C. § 2-719, which governs contractual modifications or limitations of remedies.[58]  N.Y. U.C.C. § 2-719 provides in relevant part:

> [T]he agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts[.]

---

[57] T.Co Pre-Arbitration Memo of Law, pp. 28-30
[58] T.Co Pre-Arbitration Memo of Law, pp. 29-30.

100.   Dempsey argues that T.Co was not able to supply replacement pipe. Nor did T.Co offer to give Dempsey a credit (except for an inadequate offer made in May 2006). Therefore, Clause 7.4 of T.Co's Standard Terms, which purported to limit buyer's remedies, failed as to its essential purpose.[59] Dempsey cites N.Y. U.C.C. § 2-719(2) as authority for the proposition that it may have recourse to the remedies provided for in the N.Y. U.C.C.

101.   N.Y. U.C.C. § 2-719(2) states:

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

102.   Official Comment 1 to N.Y. U.C.C. § 2-719(2) states in relevant part:

> It is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

103.   New York courts have held that, when the warrantor fails or refuses or simply cannot correct the defect as promised, within a reasonable time, the remedy has failed its essential purpose.[60]

104.   T.Co was not able to replace the defective pipe.[61] Nor did it offer a credit against the contract price.[62] N.Y. U.C.C. § 2-719(2) requires that adequate remedies be available. Although the Arbitrator acknowledges T.Co's argument that the limited remedies of

---

[59] Dempsey Pre-Hearing Memo of Law, pp. 20-21.

[60] Day Spring Enters. v. LMC International, Inc., 2004 U.S. Dist. LEXIS 19927 at *84-85 (W.D.N.Y. 2004); U.S. Metalsource Corp. v. W& B Assocs, 1997 U.S. Dist. LEXIS 4182 at *58 (S.D.N.Y. 1997); Besicorp Group, Inc. v. Thermo Electron Corp., 1993 U.S. Dist. LEXIS 43 15 at *17 (S.D.N.Y. 1993).

[61] Additional Witness Statement of Patrick Dempsey, ¶¶ 24, 26, 34, 42; Oral Testimony of Patrick Dempsey, Transcript, 13 February 2007, pp. 411, 415.

[62] Transcript, 13 February 2007, p. 270.

replacement or credit are *prima facie* fair, reasonable and enforceable,[63] in circumstances where T.Co could not, or did not, offer either of these two remedies to Dempsey, Dempsey was effectively deprived of the substantial value of its bargain. Pursuant to N.Y. U.C.C. § 2-719(2), the Limited Remedies Clauses failed as to their essential purpose, and Dempsey is entitled to have recourse to the general remedy provisions of Article 2 of the N.Y. U.C.C.

> **b.    Did the Limited Remedies Clauses fail as to their essential purpose only because Dempsey failed to offer T.Co an adequate opportunity to cure?**

105.    T.Co argues that, if the Limited Remedies Clauses failed as to their essential purpose, this was because of Dempsey's own conduct. In an email to Dempsey dated 13 September 2005, T.Co stated:

> We would like to start making arrangements to have the Cintac out-of-tolerance pipe straightened. Could you please advise by location and size the number [sic] pieces rejected.[64]

106.    When asked on cross examination whether he recalled receiving this email, Pat Dempsey stated: "I think I talked with Bevan [Jones, of T.Co] at the time."[65] When asked whether he responded in writing, Pat Dempsey stated: "I don't believe so."[66] On this basis, T.Co argues that Dempsey failed to provide T.Co with a reasonable opportunity to cure (to straighten) the out-of-tolerance pipe.[67]

107.    There are three responses to this argument. First, the Limited Remedies Clauses provide only for replacement or, "at the Seller's sole discretion, credit the Buyer with the Contract price of the goods (or a proportionate part of the price)...." There is no option for T.Co to repair (straighten) the goods. Second, the record does not establish that straightening the pipe would have returned it to a condition whereby it could be sold to Dempsey as "ASTM A53-02 Grade B, dual certified to ASME SA53-01 Grade B. Weld seam annealed", with a maximum deviation from straightness of 0.25 inches in 20 feet.

---

[63] Transcript, 19 March 2007, pp. 751-752.
[64] T.Co Exh 35.
[65] Transcript, 18 December 2006, p. 267.
[66] Transcript, 18 December 2006, p. 267.
[67] T.Co Pre-Arbitration Memo of Law, n. 15.

That is, the record does not establish that straightening the pipe would have constituted "replacement" within the meaning of the Limited Remedies Clauses. Third, the evidence is that T.Co contemplated straightening only the 0.188 inch wall pipe which Dempsey had rejected, so that it could be sold to another buyer.[68] There is no evidence that T.Co made any offer to Dempsey to straighten *all* of the out-of-tolerance pipe. Therefore, the failure of the Limited Remedies Clauses as to their essential purpose was not due to Dempsey's conduct.

108. Pursuant to N.Y. U.C.C. § 2-719(2), Dempsey can claim remedies under the N.Y. U.C.C. for the out-of-tolerance pipe Dempsey accepted from T.Co.

### 3. Quantum of Defective Pipe

109. Dempsey claimed through most of this case that, while the pipe from the Normandie V51 was not out of tolerance, all of the pipe Dempsey received from the Algarve V52 Shipment, the Toscana V53 Shipment and the Normandie V54 Shipments was out of tolerance.[69] Dempsey then clarified late in this case that, of the pipe from the Algarve V52 Shipment, Dempsey claims damages only in respect of the 0.250 inch wall pipe, and the 21 short tons of the 0.188 inch wall pipe which Dempsey accepted.[70]

110. The Arbitrator has difficulty reconciling the testimony of Pat Dempsey, Ryan Moore and Wally Dillon, proffered by Dempsey in support of the argument for a defect rate of 100%, with the Inspection Reports and written testimony of Kuffel.

111. As noted above,[71] the July and August Inspection Reports are inconclusive as to the exact quantity of pipe from the Algarve V52 Shipment which was out of tolerance. The October Inspection Report indicates that between 75% and 85% of the pipe tested from the Normandie V54 Shipment was out of tolerance. If a large percentage of the pipe was out of tolerance, a visual inspection of the pipe laid out on a feed rack might make it

---

[68] *See* Email from Thypin to the Cintac mill advising Cintac of a quote he had received from Peter Schrumpf of Prime Metals to straighten 25.1 short tons of 0.188 wall pipe. T.Co Exhibit 39. *See also* Transcript, 13 February 2007, pp. 259-263; Transcript, 20 December 2006, p. 133; Schrumpf, ¶¶ 45-46.

[69] *See* Affidavit of Patrick Dempsey, ¶¶ 19, 39; Witness Statement of Ryan Moore, ¶¶ 1, 15, 17; Witness Statement of Wally Dillon, ¶¶ 1, 10. *See also, e.g.*, Transcript, 15 December 2006, pp. 145, 243; Transcript, 18 December 2006, pp. 266, 273; Transcript, 19 December 2006, pp. 463, 491.

[70] *See* the parties' stipulation dated 3 April 2007, and email from Mr. Goldstein to the Arbitrator dated 6 April 2007.

[71] *See* ¶ 70 above.

appear that all of the pipe was out of tolerance because, as explained by Ryan Moore[72] and Wally Dillon,[73] the pipes would not lie flat against each other. This does not necessarily mean, however, that all of the pipe was out of tolerance.

112.   Kuffel stated that "I cannot consider the material that I surveyed [on 12 October 2005 at Walden, N.Y.] to be representative of all pipe from all vessels."[74]  Kuffel also stated that "Dempsey also never told me at any time during my inspections that all of the pipe was defective."[75]  The Arbitrator shares the skepticism of Kuffel that all of the pipe from the Normandie V51 would be in-tolerance, and that all of the pipe from the subsequent shipments would be out of tolerance.[76]

113.   T.Co's position on the percentage of defective pipe is also problematic. Thypin says that he believed that Dempsey's claim related only to 248 pieces of pipe,[77] even in the face of the July Inspection Report, which stated that the "of 100 pieces [of the 0.250 inch wall pipe] processed at the NH facility some 20-30 pieces were found with a bow condition"[78] and the August Inspection Report, which recorded that Dempsey was unable to process 34% of the pipe.[79]  Thypin was also present at the 12 October 2005 inspection of the pipe, where Kuffel concluded that 40-43% of the pipe was out of tolerance,[80] a fact acknowledged in Thypin's Witness Statement.[81]  Almost inexplicably, on 19 October 2005, Thypin sent an email to the Cintac mill to the effect that only 22% of the pipe was out of tolerance.[82]

114.   In light of the conflicting testimony, the Arbitrator places significant weight on the August and October Inspection Reports.

---

[72] Witness Statement of Ryan Moore, ¶¶ 16-17.

[73] Witness Statement of Wally Dillon, ¶ 10.

[74] See Witness Statement of Reinhard Kuffel, ¶ 56.

[75] See Witness Statement of Reinhard Kuffel, ¶ 62.

[76] See Witness Statement of Reinhard Kuffel, ¶ 59.

[77] See Witness Statement of Richard Thypin, ¶¶ 88-89, 106; Transcript 20 December 2006, pp. 145-146;

[78] T.Co Exh. 21.

[79] August Inspection Report , p. 7 (T.Co Exh. 21).

[80] See T.Co Ex 36. As set out in ¶ 82 above, in fact, 75-85% of the pipe measured during this inspection was out of tolerance.

[81] Witness Statement of Richard Thypin, ¶ 126.

[83] See Witness Statement of Richard Thypin, ¶ 130; T.Co Exh. 39.

###### a.    The Algarve V52 Shipment

115.    In relation to the August Inspection Report, Dempsey asks the Arbitrator to draw an inference from the fact that statements in the Report such as "the material from the subject shipment has a problem with out-of-tolerance straightness" do not contain any words of limitation such as "some of the material" or "most of the material."[83]  Dempsey argues that the only fair construction of the August Inspection Report is that it corroborates the evidence of Pat Dempsey that all of the pipe was out of tolerance.[84]  This argument is not persuasive for two reasons.  First, 28 pieces of the 56 pieces of pipe tested for the purposes of the August Inspection Report were samples which had been segregated by Dempsey as too difficult to process.  Although all of these 28 pieces were found to be out of tolerance, this sample likely had a higher rate of defect than the pipe from the Algarve V52 Shipment taken as a whole.  Second, of the other 28 pieces of pipe, which were selected at random from three bundles which were still in their original packaging as shipped from the Cintac mill, at least some of the pipe was measured as being in-tolerance for straightness.[85]  The Arbitrator is not convinced that the high rate of out-of-tolerance material reported in the August Inspection Report is representative of the whole Algarve V52 Shipment.

###### b.    The Toscana V53 Shipment

116.    Because there was no inspection of the pipe from the Toscana V53 Shipment, there is no documentary evidence of what quantity, if any, of the pipe from the Toscana V53 Shipment was out of tolerance.  However, it is likely on this record that the pipe from the Toscana V53 Shipment was affected by the out-of-tolerance condition to the same or similar extent as the pipe from the other shipments.

###### c.    The Normandie V54 Shipment

117.    As noted above,[86] the October Inspection Report [87] found that between 75% and 85% of the pipe inspected from the Normandie V54 Shipment was out of tolerance.  Of the

---

[83] Transcript, 15 December 2006, pp. 38-39.
[84] Transcript, 19 March 2007, pp. 841-847.
[85] August Inspection Report , p. 5 (T.Co Exh. 21).
[86] *See* ¶ 82 above.
[87] T.Co Ex 36.

various inspection reports, the October Inspection Report is likely to be most representative of the quantity of out-of-tolerance pipe across the entire shipment because the pipe tested appears to have been selected at random.[88] With no additional evidence available of what percentage within this range would be most accurate, the Arbitrator finds that 80% of the pipe from the Normandie V54 Shipment was out of tolerance

118.    It is appropriate, on an appreciation of all the evidence, to apply this percentage of out-of-tolerance pipe to the pipe from the Algarve V52 Shipment in respect of which Dempsey claims damages, and to the pipe from the Toscana V53 Shipment.    The Arbitrator therefore finds that 1599 short tons (80% of 1999) of combined 0.188 inch wall pipe and 0.250 inch wall pipe supplied by T.Co and accepted by Dempsey were out of tolerance for straightness.

   4.    **Calculation of Damages**

   a.    **Exclusion of consequential damages**

119.    The Exclusion of Consequential Damages Clause on page 2 of the parties' Sales Contracts provides in relevant part that "seller is not liable for consequential loss or damages."

120.    Dempsey accepts that, in the event that the Arbitrator finds that there was no Oral Compensation Agreement between T.Co and Dempsey, the Exclusion of Consequential Damages Clause is enforceable.[89]

121.    As there was no Oral Compensation Agreement between T.Co and Dempsey, the Exclusion of Consequential Damages Clause is enforceable by T.Co against Dempsey.

---

[88] *See* October Inspection Report, p. 4 (T.Co Ex 36).  On cross examination, in response to the question "And this [pipe you sent to Walden, NY] was pipe you had set aside?" Patrick Dempsey stated "No, it was just pipe we just grabbed." See Transcript, 18 December 2006, p. 344.  The Arbitrator notes T.Co's argument that Patrick Dempsey also testified that all the pipe he sent to Walden, N.Y. was out of tolerance.  *See, e.g.*, Transcript, 19 December 2006, pp. 619-620.  It is the Arbitrator's view, however, this statement is consistent with Patrick Dempsey's understanding that all the pipe was out of tolerance.  This statement does not establish that Dempsey selected the most out-of-tolerance materials to send to Walden N.Y.

[89] Dempsey Pre-Hearing Memo of Law, p. 2.

> **b.     Dempsey's counterclaim for diminished value of accepted non-conforming pipe**

122.    Dempsey's first counterclaim is for the diminished value of the out-of-tolerance pipe which it accepted.  Dempsey cites cases and commentaries which support the use of the N.Y. U.C.C. § 2-714(2) formula as the measure of damages for non-conforming goods where the buyer has accepted the goods.[90]

123.    N.Y. U.C.C. § 2-714(2) provides:

> The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.[91]

124.    N.Y. U.C.C. § 2-714(2) provides the appropriate measure of damages for non-conforming goods where the fair market value of the goods as accepted is ascertainable. In cases where the fair market value of the goods as accepted is not ascertainable, New York law directs the adjudicator to use the cost of repair of the goods as the measure for the damages suffered.  In this case, where there is some evidence of a small market for out-of-tolerance pipe,[92] the N.Y. U.C.C. § 2-714(2) formula is applicable.

> **i.     Value of the pipe as warranted**

125.    T.Co argues that the best evidence of the price that would be paid for the pipe, if it had been as warranted, is the $780 per short ton that Dempsey actually paid for the pipe (**Contract Price**).[93]  Case law cited by Dempsey establishes that, where there is evidence that the fair market value at the time and place of acceptance exceeds the contract price, the fair market value of the goods is controlling, and the buyer retains the benefit of the

---

[90] Dempsey Pre-Hearing Memo of Law, pp. 21-22. *See, e.g.*, City of New York v. Pullman, Inc., 662 F.2d. 910, 916 (2d Cir. 1981); Happy Dack Trading Co. v. Agro-Industries, Inc., 602 F. Supp. 986,993-94 (S.D.N.Y. 1984); White & Summers 510-1 at p. 702, 510-2 at p. 703-4.

[91] Dempsey Pre-Hearing Memo of Law, p. 21.

[92] There was an offer in the fall of 2005 from a third party to purchase from T.Co the 0.188 inch wall pipe which had been rejected by Dempsey.  This offer was ultimately rejected by T.Co because it was too low, but this is evidence of some market for non-conforming pipe. *See* Transcript, 20 December 2006, pp. 41-42.

[93] Transcript, 19 March 2007, p. 725.

bargain made.[94]  Here, the Contract Price is not a reliable indicator of the value of the pipe if it had been as warranted.

126.  T.Co also argues that the $922 per short ton,[95] price at which Dempsey was able to sell the pipe, after straightening it, is good evidence of the price at which Dempsey would have been able to sell the pipe, if it had been as warranted.[96]  Dempsey maintains that, although many of its clients do not require ASTM A53-02 Grade B pipe,[97] Dempsey's major clients prefer to receive pipe of that grade.[98]  Dempsey argues that it could not represent the pipe as ASTM A53-02 Grade B pipe to the clients who prefer such pipe, and that Dempsey therefore priced the pipe which it had straightened well below the market price for pipe of that grade.[99]  The Arbitrator accepts this evidence.  Therefore, an examination of other evidence of fair market value is necessary.

127.  Dempsey presents two types of evidence of the fair market value of ASTM A53-02 Grade B pipe, with a maximum deviation from straightness of 0.25 inches in 20 feet (*Subject Pipe*), at the time and place of acceptance (fall 2005).

128.  The first type of evidence is the price at which the Subject Pipe was being sold by market actors who would normally supply to an entity such as Dempsey.  Wheatland Tube Company (*Wheatland*) was presented by Dempsey as such an entity.[100]  As at 17 October 2005, Wheatland was selling 6 inch, 0.280 inch wall, A53 black pipe, plain end at $1,089 per 100 feet ($1,148 per short ton).[101]  Price increase notices from Wheatland show that, between 6 September 2005 and 17 October 2005, Wheatland had been selling A53 Grade

---

[94] *See* Chatlos Systems, Inc. v. National Cash Register Corp., 670 F.2d 1304, 1306 (3d Cir. 1982) (Chatlos II); Chatlos Systems, Inc. v. National Cash Register Corp., 635 F.2d 1081, 1088 (3d Cir. 1980) (Chatlos I). Dempsey Pre-Hearing Memo of Law, p. 24; Transcript, 19 March 2007, p. 908.

[95] Dempsey Pre-Hearing Memo of Law, p. 5.  The Arbitrator notes that, in its Amended Answer and Counterclaims, Dempsey claims that the average re-sale price of the pipe was $984 per metric ton ($892.7 per short on).  For the purpose of this award, the Arbitrator has used the value in Dempsey Pre-Hearing Memo of Law, which is corroborated by the testimony of Peter Dempsey on cross-examination, that the T.Co pipe was resold for approximately $7.80 per foot ($918 per short ton).  See Transcript, 19 December 2006, pp. 585-586.

[96] Transcript, 19 March 2007, pp. 759, 763.

[97] Transcript, 15 December 2006, pp. 205-206; Transcript, 18 December 2006, pp. 284-285.

[98] Transcript, 18 December 2006, pp. 293-294; Transcript, 19 December 2006, p. 599.

[99] Additional Affidavit of Patrick Dempsey, ¶ 88; Transcript, 19 March 2007, pp. 791, 895-897, 909.

[100] Dempsey claimed that it would apply a 25% mark up to pipe acquired from Wheatland.  See Transcript, 19 March 2007, p. 899.

[101] Dempsey Exh. 52.

B pipe for $60 less than the $1,148 per short ton price ($1,088), and that, up until 6 September 2005, Wheatland had been selling the same pipe for $60 less again ($1,028).[102]   Between May 2005 and November 2005, Stritt & Priebe Inc. (**Stritt & Priebe**) purchased Subject Pipe[103] from Wheatland for between $10.60 and $11.77 per foot ($1,116 – $1,239 per short ton).[104]  Stritt & Priebe is a small purchaser,[105] and these prices are likely higher than the average for Subject Pipe over the period.  In comparison, from 5 May 2005 to 28 November 2005, Morris was purchasing Subject Pipe for between $700 and $769 per short ton.[106]  Dempsey argues that these figures should be excluded because there is no information about the circumstances in which the Morris purchases were concluded.[107]   Morris is a direct competitor of Dempsey,[108] and Morris's selling prices track Dempsey's selling prices closely.[109]  The Arbitrator considers that the Morris prices are relevant for the purpose of comparison with the prices obtained by much smaller market actors.  On the basis of the evidence summarized above, the Arbitrator concludes that market actors at the same level in the distribution chain as Dempsey were obtaining Subject Pipe in the fall of 2005 at approximately $950 per short ton.

129.   The second type of evidence is the price at which Subject Pipe was being sold by market actors who are at the same level in the distribution chain as Dempsey.  These figures include a mark up for overhead and profit, which must be removed for the price to be representative of the value of the pipe at the time and place of acceptance, for the purpose of N.Y. U.C.C. § 2-714(2).  This evidence includes an invoice from HOW Pumps and Radiant Heat (**HOW**), showing that HOW was selling Subject Pipe at $1,290 per short ton on 1 August 2005.  Dempsey acknowledged that HOW is a smaller scale distributor, perhaps one step down the line of distribution from Morris.[110]  The HOW prices may

---

[102] Dempsey Exh. 17.

[103] The Arbitrator notes that the product in this transaction was 0.280 inch wall pipe, but accepts that this price is representative of 0.250 inch wall pipe of the same grade.

[104] Dempsey Exhs. 59, 66-69.

[105] Transcript, 19 March 2007, p. 900.

[106] Dempsey Exhs. 76, 79-85.

[107] Transcript, 19 March 2007, pp. 903-904.

[108] Transcript, 15 December 2006, pp. 159-160.

[109] T.Co Exhibit 83.

[110] Transcript, 19 March 2007, p. 903.

therefore be slightly higher than the average for the Subject Pipe over the period. The 1 August 2005 HOW invoice also includes a mark-up for threading and coupling and should therefore be subject to a downward adjustment, the amount of which was not the subject of argument before the Arbitrator. Between 19 August 2005 and 17 October 2005, Stritt & Priebe sold Subject Pipe[111] at prices ranging from $13.33 to $15.75 per foot ($1,403 - $1,658 per short ton).[112] Again, the Stritt & Priebe prices are likely to be higher than the average for the Subject Pipe over the period. By comparison, on 5 November 2005, Dempsey Steel Pipe Company sold Subject Pipe at $9.25 per foot ($1,088 per short ton). The 5 November 2005 Dempsey Steel Pipe Company invoice includes a mark-up for threading and coupling, and should therefore be subject to a downward adjustment, the amount of which was not the subject of argument before the Arbitrator. During the period from April 2005 to January 2006, Morris sold Subject Pipe at prices ranging from $681 to $1,018 per short ton.[113] Again Dempsey argues that these figures should be excluded because there is no information about the circumstances in which the Morris sales were concluded.[114] The Arbitrator is sympathetic to the argument that more information about these transactions would be needed to understand the range of Morris selling prices. In light of the evidence summarized above, the Arbitrator accepts that market actors at the same level in the distribution chain as Dempsey were reselling Subject Pipe in the fall of 2005 at a price range of approximately $1,175 to $1,200 per short ton. Removing a mark-up for overhead and profit of 25% from this price range,[115] the Arbitrator finds that the fair market value of the Subject Pipe in the fall of 2005 was approximately $950 per short ton. This is corroborative of the result in the above paragraph.

---

[111] The Arbitrator notes that the product in this transaction was 0.280 inch wall pipe, but accepts that this price is representative of 0.250 inch wall pipe of the same grade.

[112] Dempsey Exhs. 63, 65.

[113] Dempsey Exhs. 77, 86-87, 89. The Arbitrator did not consider Dempsey Exhs. 88, 90-93 because there was no evidence that these transactions related to plain end pipe.

[114] Transcript, 19 March 2007, pp. 903-904.

[115] Dempsey's cost of goods figures for July 2004 to December 2004 (the water well drilling season) show that Dempsey applies a 25% mark up to pipe purchased when it resells the pipe. *See* Dempsey Exh. 29. The Arbitrator accepts that a 25% mark up for overhead and profit is probably normal for the industry.

130.    The Arbitrator therefore concludes that the value of the Subject Pipe, in the fall of 2005, was $950 per short ton.

### ii.    Value of the pipe as accepted (out of tolerance)

131.    As a measure of the value of the goods as accepted (out of tolerance), Dempsey argues that the pipe was valuable only as scrap metal, and proposes a value of $210 per short ton.[116]  T.Co argues that the non-conforming pipe had value other than as scrap metal, as Dempsey processed and sold the pipe at or near market price.[117]  Moreover, T.Co argues, the use of the price of scrap metal as a measure of the value of the pipe as accepted would result in a pecuniary windfall to Dempsey, which is not the purpose of the formula in N.Y. U.C.C. § 2-714(2).[118]  The Arbitrator agrees with T.Co's arguments, and rejects the argument that scrap metal prices are the best measure of the value of the pipe as accepted.

132.    T.Co argues that the best evidence of the value of the non-conforming pipe accepted by Dempsey is the price at which T.Co resold the non-conforming 0.188 inch pipe rejected by Dempsey, that is, $5.038 per foot ($777 per short ton) (**Resale Price to Morris**).[119]  Dempsey argues that, because this sale took place in May 2006, it is not indicative of the fair market value of the non-conforming pipe at the time and place of acceptance, which was the fall of 2005.[120]

133.    The Arbitrator adopts the following formula for obtaining a value of the non-conforming pipe at the time and place of acceptance, against which the Resale Price to Morris may be measured:

- the price at which Dempsey was able to re-sell the pipe once it had been straightened;

- minus Dempsey's margin for overhead and profit;

---

[116] Dempsey Pre-Hearing Memo of Law p. 26; Witness Statement of Edgar Priebe, ¶ 7; Transcript, 19 December 2006, pp. 611-614; Transcript, 19 March 2007, p. 885.
[117] Transcript, 19 March 2007, p. 769.
[118] Transcript, 18 December 2006, pp. 625-626; Transcript, 19 March 2007, p. 769.
[119] T.Co Pre-Hearing Memo of Law p. 38; T.Co Exh. 50.
[120] Transcript, 19 March 2007, p. 886.

- minus the additional costs associated with processing the non-conforming pipe, which would not have been incurred if the pipe had been as warranted.

134. <u>The price at which Dempsey was able to re-sell the straightened pipe</u>. Dempsey resold the T.Co pipe for an average price of $922 per short ton.[121]

135. <u>Dempsey's margin for overhead and profit</u>. Based upon Dempsey's cost of goods figures for July 2005 to December 2005, Dempsey obtained a margin of 15.8% for profit and overhead (including normal processing costs) on the T.Co pipe.[122] Therefore, the value of the T.Co pipe after it had been straightened was $796 per short ton ($922 per short ton, divided by 115.8%).

136. <u>Additional costs associated with processing the non-conforming pipe</u>. Dempsey claims that its actual additional processing costs, caused by the non-conforming pipe, were $421,375,[123] calculated at $125 per hour.[124] However, as argued by T.Co,[125] this $125 price is Dempsey's "standard shop rate," for straightening pipe, and contains a profit element of approximately 33%.[126] The actual cost of straightening the pipe was therefore $82.5 per hour ($125 per hour, multiplied by 66%). As established in paragraph 107 above, 1599 short tons of the T.Co pipe accepted by Dempsey was out of tolerance, and therefore had to be straightened. Assuming that each piece of the pipe weighed 0.17 short tons,[127] Dempsey straightened 9406 pieces of pipe.

---

[121] Dempsey Pre-Hearing Memo of Law, p. 5. In its Amended Answer and Counterclaims, Dempsey claims that the average re-sale price of the pipe was $984 per metric ton ($892.7 per short on). For the purpose of this award, the Arbitrator has used the value in Dempsey Pre-Hearing Memo of Law, which is corroborated by the testimony of Peter Dempsey on cross-examination, that the T.Co pipe was resold for approximately $7.80 per foot ($918 per short ton). *See* Transcript, 19 December 2006, pp. 585-586.

[122] *See* Dempsey Exh. 29.

[123] In its Amended Answer and Counterclaims, ¶¶ 70-74, Dempsey claimed $538,693.75 additional processing costs and $45,050 for additional man hours for shipping and other trucking costs. In its Pre-Hearing Memo of Law, p. 28, Dempsey claimed $261,250 for additional processing costs and overtime charges of $ 8,569.64. However, at the oral hearing held on 19 March 2007, Dempsey claimed that its actual processing costs were $421,375. Dempsey's counterclaim for $45,050 for additional man hours for shipping and other trucking costs appears to have been withdrawn.

[124] Additional Witness Statement of Patrick Dempsey, ¶¶ 81-86.

[125] T.Co Analysis of Arbitrator's Question III.C – Calculation of Dempsey's Processing Costs, handed up to the Arbitrator at the hearing on 19 March 2007.

[126] Transcript, 19 December 2006, pp. 544-545.

[127] *See* T.Co Analysis of Arbitrator's Question III.C – Calculation of Dempsey's Processing Costs, handed up to the Arbitrator at the hearing on 19 March 2007. The Arbitrator understands that the pieces of 0.188 wall pipe weighed less than 0.17 short tons. However, because the significant majority of the pipe which was straightened was 0.250

137.  Dempsey claims that it took four times the usual processing time to process the out-of-tolerance pipe.[128]  The Arbitrator notes the clarification offered by counsel for Dempsey that this meant that it took twenty minutes to process each piece of pipe, rather than five minutes.  However, this directly contradicts the statement of Pat Dempsey that the extra processing costs added "about eight to ten minutes per piece" whereas "[e]ach set of threads should take approximately two minutes."[129]  Without any cross-examination of Pat Dempsey on this inconsistency, the amendment offered by counsel for Dempsey on 19 March 2007 to the evidence on the record as to how much time it took Dempsey to process each piece of non-conforming pipe cannot be accepted.

138.  At the hearing on 19 March 2007, Dempsey clarified that, when processing straight pipe, each of its four machines can process twelve pieces per hour.  When operating at normal speed, Dempsey can process 48 pieces of pipe in one hour.  When Dempsey processed the T.Co pipe, each machine was able to process only three pieces of the non-conforming pipe per hour.  Therefore a total of twelve pieces of non-conforming pipe were processed per hour.[130]  This clarification answers T.Co's argument that processing the non-conforming pipe could not possibly have taken as much time as Dempsey claimed.[131]

139.  Therefore, 9406 pieces of pipe, divided by twelve (as the number of pieces of pipe Dempsey was able to straighten in one hour), gives the number of hours which were required to straighten the non-conforming pipe, 784 hours.  This, multiplied by the cost per hour of processing the pipe, $82.5, gives the cost of processing the non-conforming pipe, $64,680.  The normal costs of processing must be deducted from this sum, to determine the additional processing costs caused by the non-conforming pipe.

140.  The normal cost of processing the 9406 pieces of pipe can be determined by dividing 9406 by the normal number of pieces normally processed in one hour, 48, and then multiplying the result (196 hours) by the cost per hour of processing the pipe, $82.5.

---

wall pipe, the Arbitrator find it acceptable to apply the figure of 0.17 short tons per piece as an average across all the pipe which was straightened.
[128] Additional Witness Statement of Patrick Dempsey, ¶¶ 85-86.
[129] Additional Witness Statement of Patrick Dempsey, ¶ 86.
[130] Transcript, 19 December 2006, pp. 921-922.
[131] Transcript, 19 December 2006, pp. 738-740.

This equals $16,167.  Therefore the additional cost of processing the non-conforming pipe was $64,680 minus $16,167, which equals $48,513.

141.    Therefore, the average additional cost of processing per short ton is $48,513 divided by the number of short tons of non-conforming pipe, 1599, which equals $30.

142.    <u>Total</u>.  As explained above,[132] the value of the T.Co pipe after it had been straightened was $796 per short ton.  According to the formula set out in paragraph 122 above, deducting the average additional cost of processing per short ton ($30) from this value ($796 per short ton) gives the value of the non-conforming pipe at the time and place of acceptance, $766 per short ton.

143.    This $766 per short ton is only $10 per short ton less than the Resale Price to Morris ($777 per short ton).  While the formula set out in paragraph 122 above is but a construction, the result achieved is evidence that the Resale Price to Morris is a reasonable measure of the value of the non-confirming pipe at the time and place of acceptance.

144.    In fall 2005, T.Co received and rejected an offer for the pipe which was then the subject of the resale to Morris in May 2006.[133]  Although there is little evidence of what that offer was, Thypin testified that it was less than the Resale Price to Morris.[134]

145.    A nominal discount of $40 per short ton to the Resale Price to Morris should be applied, representing the lower price at which the non-conforming pipe accepted by Dempsey could have been sold in the fall of 2005.  The value of the non-conforming pipe accepted by Dempsey, measured in the fall of 2005, is therefore $737 ($777 - $40) per short ton.

146.    Under the formula in N.Y. U.C.C. § 2-714(2), the difference between the value of the T.Co pipe, if it had been as warranted, at the time and place of acceptance ($950 per short ton), and the value of the non-conforming pipe accepted by Dempsey ($737 per short ton), at the time and place of acceptance, is $213 per short ton.  Therefore, pursuant to N.Y. U.C.C. § 2-714(2), the damages due to Dempsey for the diminished value of the

---

[132] *See* ¶ 124 above.

[133] Transcript, 20 December 2006, p. 42; Transcript, 13 February 2007, pp. 319-320.

[134] Transcript, 13 February 2007, p. 320.

1599 short tons[135] of pipe supplied by T.Co and accepted by Dempsey is $340,587 ($213 per short ton, multiplied by 1599 short tons).

   **c.**  **Additional processing costs**

147. Dempsey's claims damages in the amount of $421,375 for additional processing costs.[136] Dempsey argues that such costs are recoverable as incidental damages pursuant to N.Y. U.C.C. § 2-714(3), which provides that "[i]n a proper case any incidental or consequential damages under the next section may also be recovered."

148. N.Y. U.C.C. § 2-715(1) provides in relevant part that "incidental damages resulting from the seller's breach include ... any other reasonable expense incident to the delay or other breach." New York courts have treated additional processing or reconditioning costs caused by a seller's breach of warranty as incidental, and not consequential, damages.[137] Therefore, Dempsey's claim for additional processing costs is not excluded by the Exclusion of Consequential Damages Clause on page 2 of the parties' Sales Contracts.

149. Although Dempsey claims its additional processing costs totaled $421,375, as detailed above, the Arbitrator has determined that these costs were limited to $48,513.[138] Therefore, T.Co is liable to pay Dempsey $48,513 as compensation for the additional cost of processing the non-conforming pipe.

   **d.**  **Storage costs**

150. Dempsey claims damages in the amount of $56,654.32 for storage costs paid by Dempsey to DRS, for which Dempsey maintains T.Co is liable.[139]

151. It is uncontested that the additional storage costs were incurred because T.Co placed a hold on releases of pipe to Dempsey from the DRS storage facilities.[140]

152. T.Co argues that the additional storage fees were incurred because of Dempsey's failure to pay invoices on time, which led to delay in the release of product.[141]

---

[135] *See* ¶ 107 above.
[136] Transcript, 19 March 2007, pp. 915-918. *See also* n. 8 above.
[137] Indiana Farm Bureau Co-op. Ass'n, Inc. v. Sovereign Farlenne, 1977 WL 25551 *1525 (S.D.N.Y. 1977).
[138] *See* ¶ 129 above.
[139] Dempsey Pre-Hearing Memo of Law, p. 28.
[140] Witness Statement of Richard Thypin, ¶ 137; T.Co Exh. 39.

153.  Clause 9.1 of T.Co's Standard Terms provides in relevant part:

> The Seller shall be entitled ... to suspend any further deliveries under the Contract ... if any debt is due and payable by the Buyer to the Seller but is unpaid.

154.  There is insufficient evidence to support any invocation by T.Co of a right to suspend further releases of pipe to Dempsey under Clause 9.1 of T.Co's Standard Terms.[142]

155.  Even if T.Co was entitled to suspend further releases of pipe to Dempsey, neither the Sales Contracts, nor T.Co's Standard Terms incorporated therein, state which party is liable for the resultant storage costs.  Clause 2.2 of T.Co's Standard Terms provides that the buyer is liable for additional storage costs where the buyer has failed to collect the goods when they are released by the seller.  If the parties had intended Dempsey (the buyer) to be liable for storage costs incurred in the event that T.Co (the seller) elected to suspend releases of material to Dempsey, they would likely have included a provision similar to Clause 2.2 of T.Co's Standard Terms in their Sales Contracts.

156.  There was no agreement between the parties that Dempsey would be liable for storage costs incurred when T.Co elected to suspend releases of material.  T.Co is liable for the storage costs.

157.  T.Co must therefore reimburse to Dempsey the $56,654.32 in storage costs paid to DRS.

### e.    Freight charges

158.  Dempsey claims damages in the amount of $31,803 for freight charges incurred to transport the most severely bent pipe from its Hooksett, N.H. operation to Bolivar, N.Y.,[143] and $1,686 for freight charges incurred to transport pipe to and from Walden, N.Y. for inspection by T.Co and the Cintac mill.[144]

159.  Case law cited by Dempsey treats expenses incurred in attempting to mitigate damages as incidental damages.[145]  The most severely bent pipe was transported by Dempsey from

---

[141] T.Co Pre-Hearing Memo of Law p. 45; Witness Statement of Richard Thypin, ¶¶ 137-138.

[142] The Arbitrator has reviewed T.Co Exh. 39, but considers that this issue was not adequately pleaded before him.

[143] Dempsey Pre-Hearing Memo of Law, p. 29.

[144] *Id.*

[145] Carbontek Trading Co. v. Phibro Energy, Inc., 910 F.2d 302 (5th Cir. 1990) (applying New York law). *See also* Indiana Farm Bureau Co-op. Ass'n, Inc. v. Sovereign Farlenne, 1977 WL 25551 *1524-5 (S.D.N.Y. 1977).

Dempsey's Hooksett, NH operation to its Bolivar, N.Y. operation because this pipe could be cut and processed only by using the machines at the Bolivar location. This pipe would otherwise have been un-useable.[146]

160.    Dempsey incurred freight charges in the amount of $31,803 to mitigate its damages. T.Co is liable to reimburse this sum to Dempsey as incidental damages.

161.    Under New York law, costs associated with testing goods for defect are normally recoverable as incidental damages pursuant to N.Y. U.C.C. § 2-715(1).[147]  However, Clause 6.2 of T.Co's Standard Terms provides in relevant part that "[a]ny inspection made shall be at the Buyer's expense...."  This clause covers the cost of transporting material for inspection.  Therefore, the $1,686 in freight charges incurred to transport pipe to and from Walden, N.Y. for inspection by T.Co and the Cintac mill is for the account of Dempsey.

### 5.    Interest

162.    T.Co asks for interest on the amount of its outstanding invoices to Dempsey at a rate of 9%, from 1 January 2006 to the date of payment.[148]

163.    Dempsey requests "appropriate interest" with no submission as to applicable rate.[149]

164.    Clause 3.3 of T.Co's Standard Terms provides:

> The Seller shall be entitled to charge the Buyer interest on a daily basis on overdue payments at the rate of 3% per annum over Prime Rate of interest charged by the JP Morgan Chase Bank in the City of New York from time to time in force....

165.    A rate of interest of 9% per annum is reasonable in light of the parties' submissions and Clause 3.3 of T.Co's Standard Terms.[150]  All interest awarded in this Award is calculated at a rate of 9% per annum.

---

[146] *See* Additional Witness Statement of Patrick Dempsey, ¶ 105.
[147] *See* Creusot-Loire Intern., Inc. v. Coppus Engineering Corp., 585 F.Supp. 45, 51 (S.D.N.Y. 1983); Indiana Farm Bureau Co-op. Ass'n, Inc. v. Sovereign Farlenne, 1977 WL 25551 *1524-5 (S.D.N.Y. 1977).
[148] T.Co Pre-Arbitration Memo of Law, p. 46.
[149] Dempsey Amended Answer and Counterclaims, ¶ 91.

6.     **Costs and Attorneys' Fees**

166.  The parties appear to agree that this issue is governed by the "Arbitration" Clause on page 2 of the parties' Sales Contracts.[151]  This clause provides that "[t]he costs and expenses of the prevailing party (including, without limitation, reasonable attorneys' fees) will be paid by the other party".  In circumstances where T.Co is the prevailing party on its claim, and Dempsey has prevailed on a part of its counterclaims, the Arbitrator has exercised his discretion in deciding how fees and costs should be allocated.

167.  T.Co's Application for Initial Award was an unnecessary step in the proceedings, and Dempsey was the "prevailing party" in relation in this application.  T.Co shall therefore bear Dempsey's legal fees and costs of preparing for, and attending, the 17 November 2006 hearing on T.Co's Application for Initial Award, which Dempsey estimates to be $50,000.[152]  The Arbitrator finds that $40,000 is to be awarded to Dempsey in respect of such application.

168.  Dempsey's correspondence, objections and applications in relation to the subpoena *duces tecum* issued to Morris by the Arbitrator on 4 January 2007 (***Morris Applications***), between 22 December 2006 and 9 February 2007, created unnecessary work on the part of T.Co.  T.Co states that its legal fees associated with the Morris Applications, including the federal court proceedings, amount to $25,684.[153]  While the Arbitrator is not in a position to order Dempsey to pay T.Co's costs associated with the federal court proceedings, Dempsey can be held liable here for T.Co's legal fees and costs associated with the Morris Applications, not including the federal court proceedings.  The Arbitrator finds that $18,000 is to be awarded to T.Co.

169.  Except as stated above, each party shall bear its own legal fees and costs, including fees for expert witnesses.  The parties shall also divide evenly the costs of this arbitration,

---

[150] JP Morgan Chase's recent Historical Prime Rates are: 8.25% (29 June 2006); 8.00% (10 May 2006); 7.75% (28 March 2006) and 7.50% (31 January 2006), *available at* http://www.jpmorganchase.com/cm/cs?pagename=Chase/Href&urlname=jpmc/about/newsroom/histprime.

[151] *See* T.Co Attorney's Fees Submission dated 9 March 2007, sent under cover of email dated 9 March 2007; Dempsey Pre-Hearing Memo of Law, p. 29.

[152] Dempsey Comments on Attorney's Fees and Costs of Arbitration, sent by email dated 9 March 2007.

[153] T.Co Attorney's Fees Submission dated 9 March 2007, sent under cover of email dated 9 March 2007.

including the administrative fees and expenses of the ICDR, the Arbitrator's compensation and expenses and the cost of the transcripts of the hearings.

**C.     Rulings**

170.   I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreements entered into between the above-named parties and dated 25 February 2005 and 25 April 2005, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

Within 30 days from the date of transmittal of this Award to the parties, T.Co and Dempsey shall pay the following sums:

- The administrative fees and expenses of the ICDR totaling $17,250 shall be borne equally by the parties. Therefore, T.Co shall reimburse Dempsey the sum of $2,625.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Dempsey.

- The compensation and expenses of the Arbitrator totaling $216,107.44 shall be borne equally by the parties.

- Because there was no binding Oral Compensation Agreement between T.Co and Dempsey, Dempsey is liable to pay T.Co $338,039.72 on T.Co's outstanding invoices, plus interest at a rate of 9% per annum, calculated from 1 January 2006 to the date of payment.

- T.Co is liable to pay to Dempsey damages in the amount of $340,587 for the diminished value of the pipe supplied by T.Co, and accepted by Dempsey, plus interest at a rate of 9% per annum, calculated from 22 September 2006[154] to the date of payment.

- T.Co is liable to pay Dempsey $48,513 as compensation for the additional cost of processing the non-conforming pipe, plus interest at a rate of 9% per annum, calculated from 1 January 2006 to the date of payment.

---

[154] 22 September 2006 is one month from the date on which Dempsey submitted its Answer and Counterclaims, 22 August 2006.

- T.Co is liable to reimburse $56,654.32 to Dempsey, being the amount Dempsey paid to DRS for storage, plus interest at a rate of 9% per annum, calculated from 16 November 2005[155] to the date of payment.

- T.Co is liable to reimburse $31,803 to Dempsey as incidental damages for freight charges incurred to mitigate Dempsey's loss as a result of the non-conforming goods, plus interest at a rate of 9% per annum, calculated from 29 December 2005[156] to the date of payment.

- T.Co is liable for Dempsey's legal fees and costs of preparing for, and attending, the 17 November 2006 hearing on T.Co's Application for Partial Award, in an amount of $40,000.

- Dempsey is liable for T.Co's legal fees and costs associated with the Morris Applications, not including the federal court proceedings, in an amount of $18,000.

- Except as stated above, each party shall bear its own legal fees and costs, including fees for expert witnesses. The parties shall also divide evenly the expenses and the cost of the transcripts of the hearings.

This Amended Final Award is in full settlement of all claims and counterclaims submitted to this Arbitration.

---

[155] 16 November 2005 is the date Dempsey paid the DRS invoice. *See* Dempsey Exh. 23; Dempsey Pre-Hearing Memo of Law, p. 28.

[156] 29 January 2005 is the date on which the last Dempsey delivery truck made a detour to deliver non-conforming pipe from its Hooksett, NH operation to its Bolivar, N.Y. facility. *See* Dempsey Exh. 33.

42

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Amended Final Award was made in New York, NY.

_____          _____
Date                                                              **Paul D. Friedland**
                                                                      Sole Arbitrator

State of New York        ⎫
                                   ⎬  SS:
County of New York      ⎭

I, Paul D. Friedland, Esq., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Award.

_____          _____
Date                                                              **Paul D. Friedland**
                                                                      Sole Arbitrator

Sworn to before me this
4th day of June, 2007

_____
Notary Public

JEANMARIE G. McELROY
Notary Public, State of New York
No. 01MC4605759
Qualified in Queens County
Certificate Filed in New York County
Commission Expires October 31, 2009

43