IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Arbitration Between<br><br>T.CO METALS LLC,<br><br>      Petitioner/Plaintiff,<br>v.<br><br>DEMPSEY PIPE & SUPPLY, INC.,<br><br>      Respondent/Defendant. | No. 07 CV 7747 (PAC) |
| DEMPSEY PIPE & SUPPLY, INC.,<br><br>      Petitioner<br>v.<br><br>T.CO METALS LLC,<br><br>      Respondent | No. 07 CV 7749 (PAC) |

## SECOND DECLARATION OF ALFRED J. KUFFLER, ESQUIRE

ALFRED J. KUFFLER, an attorney duly admitted to practice law before the Courts of the State of New York, this Court, and the Commonwealth of Pennsylvania, hereby affirms the following under penalty of perjury:

1. I am a partner of the firm Montgomery, McCracken, Walker & Rhoads, LLP, attorneys for T.Co Metals LLC ("T.Co"), which was the Claimant in the arbitration before the American Arbitration Association's International Centre for Dispute Resolution ("ICDR"), Number 50 143 T 00278 06. I make this affirmation in support of T.Co's application to modify or vacate the Final Arbitration Award in this arbitration.

2.   Attached as Exhibit A is a true and correct copy of T.Co Metals LLC Analysis of Arbitrator's Question III.C – Calculation of Dempsey's Processing Costs, which was submitted to Arbitrator Friedland during the final argument on March 19, 2007 in this arbitration.

3.   Attached as Exhibit B is a true and correct copy of certain pages from the transcript of the proceedings before the sole arbitrator, Paul D. Friedland, Esq. ("Arbitrator Friedland"), held on December 19, 2006.

I declare under penalties of perjury of the laws of the United States the foregoing is true and correct.

_____
Alfred J. Kuffler (AK 2275)

Dated: Philadelphia, Pennsylvania
       November 6, 2007

2238681v1

# EXHIBIT A

## T.Co Metals LLC Analysis of Arbitrator's Question III.C
## Calculation of Dempsey's Processing Costs

| Description of Calculation | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Number of defective pieces processed | Divided by the number of pieces processed per hour (which gives the number of hours of processing) | Multiplied by the processing cost per hour (which gives the cost of processing the out-of-tolerance pipe) | Minus the cost of processing the same number of pieces of normal pipe, which equals: | Number of defective pieces processed | Divided by the number of pieces processed per hour normally (which gives the number of hours of processing normally required) | Multiplied by the processing cost per hour (which gives the cost of processing the pipe had it been within tolerance) | Which equals (which gives the difference between actual processing (3) minus normal processing (7)) |
| Calculation | | | | | | | |
| 1,550 divided by .17 = 9,117.6 | 9,117.6 divided by 9 = 1,013.1 hours | 1,013.1 multiplied by $82.50 = $83,580.75 | | 1,550 divided by .17 = 9,117.6 | 9,117.6 divided by 12 = 759.8 hours | 759.8 multiplied by $82.50 = $62,683.50 | $20,897.25 |

| \ | Explanation and Documentation of Figures Used in Calculations |
|---|---|
| **Figure** | **Explanation and Documentation** |
| 1,550 short tons (ST) (columns 1 and 5) | *Assuming that the Arbitrator accepts that the survey reports provided contractually required notice,* 620 metric tons (MT) of .250 wall from ALGARVE plus 770 MT of .250 wall from NORMANDIE V54 plus 19 MT of .188 wall received and not rejected by Dempsey equals 1,409 MT or (when multiplied by a conversion rate of 1.1) 1,550 ST.<br><br>Stated differently, 2,440 metric tons (MT) sold minus 401 MT of .250 wall aboard the NORMANDIE V51 (no claim) minus 405 MT of .250 wall aboard TOSCANA minus (absolutely no notice) 100 MT of .280 wall from the ALGARVE (absolutely no notice) minus 126 MT of the .188 wall from the ALGARVE (rejected) equals 1,408 MT or 1,549 ST. *See* T.Co Ex. 10 for MT per wall size per vessel. (Note that Respondent's Amended Answer and Counterclaim contains erroneous figures). |
| .17 ST per piece (columns 1 and 5) | For the .250 wall, 17 pounds per foot times 20 feet divided by 2,000 pounds equals .17 ST per piece. (Note that the Arbitrator's figure calculated the weight per piece on a MT basis). |
| 9 "out-of-tolerance" pieces per hour (column 2) | Approximately 82% of all .250 wall pipe was processed in Hooksett (*see* T.Co Ex. 81), which threads pipe four days a week for ten hour shifts (*see* 12/19/06 Tr. 498:2-3, 17-18). As set forth in T.Co Ex. 82, which analyzes the total sales per month of the .250 wall sold to customers serviced by the Hooksett facility, during the months of July 2005 to December 2005 (when it is alleged that the "out-of-tolerance" pipe was processed), Dempsey processed, on average, 123 (line 156), 65 (line 187), 112 (line 225), 79 (line 254), 94 (line 283), and 75 (line 308) pieces per working day.<br><br>Averaging those monthly figures, during this period Dempsey processed on average 91 pieces per 10-hour day or 9 pieces per hour. Dempsey's unsupported assertion that it processed only 3 pieces per hour lacks any basis in the record or reality and would mean that Dempsey, using its own figures on the number of pieces claimed, would *still* be processing T.Co material. |
| $82.5 processing cost per hour (columns 3 and 7) | According to Peter Dempsey, Dempsey's $125 per hour rate is a "standard shop rate" (12/19/06 Tr. 541:16-18) that includes a profit margin of approximately 33% (*id.* at 541:22-542:3). Accordingly, an appropriate measure of Dempsey's hourly processing *cost* is at most $125 times 66%, or $82.50 per hour. |
| 12 normal pieces per hour (column 6) | *See* Additional Affidavit of Patrick Dempsey, ¶ 82. |

# EXHIBIT B

Page 546

Peter Dempsey - Recross

1  for, what you actually could -- sorry, what you
2  actually did sell it for?
3      A.  Okay.
4      Q.  Isn't that just another way of saying
5  you are looking for a lost profit?
6      A.  No. This figure was for the work that
7  we --
8      Q.  No, I understand that, but I'm asking a
9  different question. Forget the processing cost
10 piece of this for a minute.
11     A.  Okay.
12     Q.  Another portion of your claim has to do
13 fundamentally with the differential between what
14 you did sell the T.Co supplied pipe for and what
15 you anticipated being able to sell it for had it
16 been in sound condition; is that correct?
17     A.  Yes. That sounds correct, yes.
18     Q.  Now, that's essentially a lost profit
19 item in and of itself.
20         MR. GOLDSTEIN: The legal --
21         THE ARBITRATOR: Sustained.
22     Q.  Are you contending in this claim,
23 Mr. Dempsey, that you lost profits because of the
24 condition of this pipe?

Page 547

Peter Dempsey - Recross

1      A.  Yes.
2      Q.  And conceptually how are you
3  calculating that loss?
4          MR. GOLDSTEIN: Once again, the legal
5      contentions will speak for themselves. And
6      the arbitrator will appreciate at the
7      appropriate time any disparity between the
8      understanding of the client and the claims
9      advanced through counsel.
10         THE ARBITRATOR: I understand that. If
11     Mr. Dempsey can answer, he can.
12     A.  I really don't know how to answer it.
13     Q.  Let me take the word "profit" out of
14 the question.
15         How are you calculating the difference
16 between what you sold the T.Co supply pipe for and
17 what you thought you could sell it for had it been
18 in sound condition?
19     A.  How are we calculating the condition in
20 the sales price?
21     Q.  Yes.
22     A.  Well, we take what we could have bought
23 the pipe for on the domestic market and our
24 typical markup of 25 percent over and above what

Page 548

Peter Dempsey - Recross

1  we would have paid and establish a price on that.
2  I think we came up with $1300 a ton that we could
3  have sold the pipe for.
4      Q.  Okay. But you are figuring in your
5  markup in that calculation?
6      A.  Yes.
7      Q.  Now we come back to the processing
8  cost. That also has a markup in it the way you
9  figured it, does it not?
10     A.  Sure.
11     Q.  But in order to get the markup on the
12 loss in the sales, you had to do this processing
13 and you did that internally.
14         That's two questions.
15         You had to do this processing, correct?
16     A.  The additional processing.
17     Q.  I stand corrected.
18         And there was no actual markup in that,
19 was there?
20     A.  Nothing that we can pass on to our
21 customers.
22     Q.  But in fact you didn't incur any markup
23 in doing that? You didn't pay an outsider to do
24 that or did you?

Page 549

Peter Dempsey - Recross

1      A.  No, we did it ourselves.
2      Q.  You did it yourselves with your own
3  labor?
4      A.  Right.
5      Q.  As I understand the claim, there is
6  some overtime, some modest component of overtime
7  for your employees to do this.
8      A.  Yes, and we hired an additional
9  employee at Bolivar.
10     Q.  You paid him an additional 9,000, as I
11 recall.
12     A.  Probably.
13     Q.  Now, your own people who did the extra
14 processing, what would they be paid?
15     A.  In the area we have two employees that
16 are probably making around $10 an hour.
17     Q.  Okay. And I think we heard Mr. Dillon
18 this morning. Was he involved in the extra
19 processing?
20     A.  Mostly the sorting.
21     Q.  But he was salaried, is that correct?
22     A.  That's right.
23     Q.  So there isn't any extra cost in using
24 Mr. Dillon's services, was there, for the extra

25 (Pages 546 to 549)